CLOROBEN CHEMICAL CORPORA-
TION, a New Jersey corporation,
Defendant Below, Appellant,

v.

Charlotte COMEGYS, Individually and as
Guardian Ad Litem for Angela Comegys,
a minor, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted: June 13, 1983.
Decided: July 28, 1983.

888

Ernest S. Wilson, Jr. (argued) and Robert Aulgur, Jr. of Wilson, Whittington & Aulgur, Wilmington, for appellant.

Alan Schwartz (argued) of Anapol, Schwartz, Weiss & Schwartz, Philadelphia, Pa., and Robert B. Coonin of Berkowitz, Greenstein, Schagrin & Coonin, P.A., Wilmington, for appellee.

Before HERRMANN, C.J., and McNEILLY and HORSEY, JJ.

McNEILLY, Justice:

This appeal and cross-appeal concerns a successful products' liability action brought by the plaintiffs, Angela Comegys (Angela) and her mother, Charlotte Comegys (Charlotte), against the defendants, Alfred A. Dorsey, Inc. (Dorsey) and Cloroben Chemical Corporation (Cloroben).

## I

On July 21, 1976 Angela and Charlotte were in their Wilmington apartment when a plumber, Alfred Dorsey, arrived as requested, to unclog the drain. Upon realizing that he could not manually unclog the drain, he went to Speakman's Plumbing Company and purchased a one quart container of Drain Snake, a product which he had previously used to dissolve foreign matter clogging drains. Defendant Cloroben was the formulator, packager and distributor of this ninety-five per cent sulfuric acid product. The drain cleaner was packaged by Cloroben in a plastic bottle with a standard screw on top covering a red pop-lock closure, which was intended to be a child resistant feature.

Upon returning to the Comegys' apartment, Mr. Dorsey unscrewed the top cap from the Drain Snake bottle. Realizing he needed another tool from his car, he placed the container on a windowsill adjacent to the sink, and went out to his car. Up to this point, Mr. Dorsey, had not removed the red pop-lock closure. Upon returning to the apartment Mr. Dorsey heard screaming and hollering coming from the bathroom. He observed that the bottle of Drain Snake was open and on the kitchen floor in front of the sink with its contents leaking on the floor. The red pop-lock closure was off the bottle and was nowhere in sight. Mr. Dorsey rushed to the bathroom where he observed Charlotte throwing water on Angela's smothering body.

As a result of being splashed with Drain Snake Angela received severe second and third degree burns over approximately twenty per cent of her body including most of her right arm and chest to the midline and abdomen, face, and right leg. The area of the right breast was all but eradicated. As a result of these injuries Angela has undergone several surgical procedures, and in the future it will be necessary for her to undergo additional surgical procedures. Further, Angela has suffered and will continue to suffer severe psychological problems as the result of her accident.

In the course of the three years of discovery prior to the trial Cloroben was repeatedly asked to produce its claims files relating to accidents involving its Drain Snake products. Specifically, plaintiffs served interrogatories on Cloroben which requested in part:

"18. State whether prior to the incident in question your company received complaints, correspondence or other communications of burns or personal injuries associated with the use of your product, as it related to accidental spillage of its contents or if the container was accidentally dropped or if pressure was applied to it.

20. State whether your company received subsequent to the incident in question, complaints, correspondence or other communications of burns or personal injuries associated with the use of your product, as it related to accidental spillage of its contents, if the container was accidentally dropped and/or pressure was applied to it.

22. State whether any legal actions prior to or subsequent to this action have been filed against your company, or against vendors selling your product concerning personal injuries or death allegedly associated with accidental spillage of its contents, or if the contents were accidentally dropped or if pressure was applied to it.

These interrogatories were answered negatively under oath by Milton Davis, Cloroben's Vice-President, on April 5, 1979. For over two years plaintiffs believed these answers to be true until in late 1981 they learned through the pre-trial deposition of Stanley F. Moat, that Cloroben had, in fact,

received numerous claims concerning Drain Snake. At this time plaintiffs renewed their attempt to get this information, and eventually six claims files were produced, less than one month before trial, which were represented to be Cloroben's entire claims file.

At trial after it became apparent that there were indeed more claims files still in Cloroben's possession that had not been produced to plaintiffs, the Court ordered an in camera deposition of Davis at which time he admitted that Cloroben had an extensive claims file which had not been produced. The following day Cloroben's trial counsel submitted certain correspondence to the Court which demonstrated that he had advised Cloroben as early as August, 1981 of the deficiency of its interrogatory answers. Several days after Davis' deposition, during mid-trial Cloroben produced several boxes containing thousands of documents, all relating to claims or suits filed against Cloroben as a result of Drain Snake accidents.

At the close of trial the jury returned a verdict against Dorsey and Cloroben as joint-tortfeasors for compensatory damages in the amount of $185,000 ($160,000 for Angela and $25,000 for Charlotte). It also awarded punitive damages of $120,000 against Cloroben alone. In response to a special interrogatory, the jury allocated responsibility for the compensatory damages on an 80%/20% basis with Cloroben bearing the larger proportion.[1]

## II

The crux of Cloroben's appeals revolves around the jury's award of punitive damages. Cloroben contends that the jury improperly awarded punitive damages in that (1) they were not supported by a preponderance of the evidence and (2) they were so excessive and disproportionate as to indicate that the jury acted out of passion or prejudice. As a third ground Cloroben maintains that certain of the Trial Court's instructions on punitive damages were confusing, improper and constituted a comment on the evidence resulting in plain error. We first turn to Cloroben's argument on the instructions themselves.

At the request of the plaintiffs and over no objection at trial by defendants, the Trial Judge gave the following instructions as to the issue of punitive damages:

"And second, the financial circumstances of the defendant may be considered. The function of deterrence will not be served if the financial circumstances of the defendant allows it to absorb the award with little or no loss."

\* \* \* \* \* \*

"Cloroben, through its Vice President, offered testimony to the effect that the interrogatories propounded were misunderstood and that the answers given were not made with any interest or purpose to hide or deceive; and that, furthermore, the witness had no recollection of being advised, by counsel or otherwise, that the answers given in 1979 were incorrect or improper. With respect to this latter contention, the Court can advise you that I have *in my possession certain correspondence which, although not presented to you as evidence, you may consider as such, which demonstrates that Cloroben's counsel did, in fact, advise Cloroben, as early as August, 1981, specifically of the deficiency in its interrogatory answers and that Cloroben, through its Vice-President, in fact did respond and produced certain material. Unfortunately, this material was transmitted to Cloroben's insurance carrier and not to plaintiffs' counsel nor its own counsel.*"

---

1. Prior to trial, plaintiffs settled with Dorsey for $160,000 ($152,000 for Angela and $7,500 for Charlotte) but Dorsey remained as a party at trial without disclosure to the jury of the settlement. In a post trial ruling the Superior Court held that this $160,000 settlement should be credited against the judgment. This ruling has not been appealed and as a result the present outstanding judgment against Cloroben is $25,000 in compensatory damages ($17,500 in favor of Charlotte and $7,500 for Angela) and $120,000 in punitive damages ($20,000 for Charlotte and $100,000 for Angela).

"If you find, by a preponderance of the evidence, that when answering interrogatories or when giving answers during the depositions, Cloroben gave incorrect or misleading answers to questions, whose purpose was to disclose evidence, whether prior to July 21, 1976, Cloroben had been informed of claims of damage or injury due to spillage or leakage of Drain Snake, then you *should infer* Cloroben had, in fact, prior to July 21, 1976, received claims of damages or injuries from spillage or leakage of Drain Snake and the evidence suppressed would, if fully disclosed have been unfavorable to Cloroben."

At oral argument before this Court plaintiffs' counsel, Alan Schwartz, asserted that the above instructions were agreed to by both plaintiffs' and defendants' counsel during an in chambers prayer conference with the Trial Judge. Schwartz stated that the instruction was the result of a compromise in which the defendant agreed to the instruction, and in return for this the letters submitted by Cloroben's counsel, which demonstrated that counsel had advised Cloroben in August, 1981 of its deficient interrogatory answers, would not be submitted to either the jury or plaintiffs' counsel.[2] When questioned by this Court as to whether this prayer conference was in the record Schwartz stated that his recollection was that the conference was recorded by the Court Reporter although it did not appear in the transcript and apparently was not recorded. Following this exchange this Court questioned Cloroben's trial counsel, who stated that he also remembered the Court Reporter being at the conference. As to the issue of whether the instruction was a compromise, Cloroben's trial counsel stated that he had no recollection one way or the other as to whether the instruction was a compromise.[3] At this point this Court heard from the other two attorneys for the plaintiffs who were present at this conference, both of whom corroborated the statement of Schwartz.

■ While this Court as a rule does not consider material outside of the record, the uncontroverted assertions in open court by three attorneys for plaintiffs that the instructions were agreed to by both parties plus the fact that defendants' counsel made no objection to them in the Superior Court lead us to conclude that the instructions were agreed to by all parties. In that the instructions were agreed to by all parties Cloroben is barred from challenging them in this Court. *See* Superior Court Civil Rule 51; *Chrysler Corporation v. Quimby,* Del.Supr., 144 A.2d 123 (1958).

### III

■ We now turn to Cloroben's contention that the jury improperly awarded punitive damages in that they were not supported by a preponderance of the evidence. Punitive damages are recoverable where the defendant's conduct exhibits a wanton or wilful disregard for the rights of plaintiff. *Riegal v. Aastad,* Del.Supr., 272 A.2d 715, 718 (1970). For defendant's conduct to be found wilful or wanton the conduct must reflect a 'conscious indifference' or 'I don't care' attitude. *Eustice v. Rupert,* Del. 460 A.2d 507 (1983).

■ Our review of the record indicates that there is sufficient evidence to support a finding that Cloroben acted in a wilful or wanton manner against plaintiffs. The evidence supporting such a finding includes the following: Cloroben sold Drain Snake with full knowledge that sulfuric acid is a dangerous product; Cloroben was aware that Drain Snake was being made available to the general public in hardware stores and supermarkets when, in fact, it was meant for professional use only; Cloroben was aware of a number of injuries caused by Drain Snake; Cloroben wilfully failed to produce claims files regarding accidents in-

2. Plaintiffs' counsel first saw these letters when Cloroben attached two of them to its appendix in this Court.

3. Cloroben's trial counsel was not Cloroben's counsel of record on appeal.

volving Drain Snake, despite plaintiffs continued discovery efforts; and Cloroben was aware that its product and package were unsafe yet continued to package it in the same manner. In that the above evidence was presented to the jury and reflects a conscious indifference and I don't care attitude on the part of Cloroben, we must reject the argument that there was insufficient evidence to support an award of punitive damages.

■ Cloroben's final contention relating to the issue of punitive damages goes to the amount awarded. Relying on *Riegal v. Aastad,* supra, Cloroben maintains that the punitive damages award is improper as the award is so excessive and disproportionate to the compensatory damage award as to indicate that the jury acted out of passion or prejudice. We find no merit to this argument.

While an award of punitive damages may not be disproportionate in amount to the award for compensatory damages, *Reynolds v. Willis,* Del.Supr., 209 A.2d 760 (1965) this Court is ever mindful of what was said in *Riegel v. Aastad,* supra,

"... A verdict will not be disturbed as excessive unless it is so clearly so as to indicate that it was the result of passion, prejudice, partiality, or corruption; or that it was manifestly the result of disregard of the evidence or applicable rules of law. A verdict should not be set aside unless it is so grossly excessive as to shock the Court's conscience and sense of justice; and unless the injustice of allowing the verdict to stand is clear."

Our review of that part of the record which led us to conclude that there was sufficient evidence justifying punitive damages also supports a conclusion that an amount of $120,000 does not shock this Court's conscience and sense of justice.

## IV

Cloroben's final argument in support of its appeal is that the Trial Court erred when it excluded testimony relating to industry wide use of pop-lock closures. We disagree.

James Callahan, the person who sold the plastic bottle and pop-lock closure at issue in the instant case to Cloroben, was called as a witness by Cloroben. During his direct examination, the following exchange occurred:

"Q. Mr. Callahan, we've been over your participation in the sale of containers and pop-lock inserts and closures to Cloroben for use with sulfuric acid drain cleaners.

A. Yes.

Q. Did you sell similar containers for use with pop-lock enclosures to other manufacturers of a drain cleaner containing concentrated sulfuric acid?

A. Yes, I did.

MR. SCHWARTZ: Objection, Your Honor.

THE COURT: Relevancy?

MR. SANDERS: That they were used by many people in the industry, Your Honor.

THE COURT: The issue is whether this company was negligent, as I understand it. That's the only issue, not what others might have done. We certainly aren't going to explore their processes of distribution, et cetera.

MR. SANDERS: I didn't expect to do that, Your Honor.

THE COURT: Well, that's what it is leading to. Objection sustained."

Shortly before this exchange an identical question was asked by Cloroben's counsel. When objection was made, counsel made the following offer of proof:

I had intended to ask the witness about his knowledge of marketing systems—not marketing systems, actually, marketing policy would be a better way of describing it—of other sulfuric acid drain distributors, and how that relates to Cloroben's marketing policy. And I anticipated his answers would be that Cloroben had originated the policy of selling to the professionals only and not marketing to householders; and that many other lead-

ing distributors of sulfuric acid drain cleaner have followed Cloroben's lead in that regard and have also so restricted their sales. And to me, I thought that was relevant and material testimony on the issue of punitive damages, whether or not Cloroben was wanton or not, limiting the distribution of their product."

After hearing plaintiffs' response the Trial Court sustained the objection stating:

"Based on the discussion at side bar, and I think a sufficient showing has been made on the record now, satisfies the Court that what the witness was about to be asked about marketing procedures, the handling of this product or like product, would call for, in the judgment of the Court, more expertise.

This gentleman has not been presented here to inform as an expert in this area. On that ground, I think the testimony that was to be elicited is objectionable, and so ruled."

In this appeal Cloroben does not contend that the evidence was relevant to liability but argues that it was relevant to the issue of punitive damages. Our review indicates that the issue of Cloroben's wilful or wanton conduct toward plaintiffs went to its failure to alter its packaging and seals after it had knowledge of injuries resulting from unsafe packaging. What the industry custom was in regards to what type of packaging was used is simply not relevant to Cloroben's motive in not altering the type of packaging it used after it had knowledge that the existing manner was defective. Even assuming the question was relevant, it was properly excluded in that it called for expertise which Callahan did not possess, and even had he possessed it he was barred from testifying because defendant did not inform plaintiffs during discovery that he would be an expert on the marketing system of sulfuric acid drain distributors. *See Stafford v. Sears Roebuck & Co.,* Del.Supr., 413 A.2d 1238 (1980).

V

On cross-appeal plaintiffs relying upon *Storey v. Camper,* Del.Supr., 401 A.2d

458 (1979) urge that a reasonable jury could not have reached the result obtained in this case, and that the Trial Court abused its discretion in not awarding additur or a new trial on the issue of damages. In that the record indicates that there was a wide range of testimony concerning the costs of future medical expenses going from $87,355 to $175,375, we cannot say that the award of $160,000 shocks the conscience and sense of justice of the Court. *Id.* at 464, fn. 6. Therefore, plaintiffs' contention on cross-appeal must be rejected.

VI

The instant case provides another example of this Court being confronted with the problem of the absence of a complete record of all pertinent exchanges between a Trial Court and counsel. *See Bailey v. State,* Del.Supr., 440 A.2d 997, 1000 fn. 1 (1982). In this case a critical prayer conference appears to have been held without being recorded by a Court Reporter although counsel for both plaintiffs and defendants recall that a Court Reporter was present. A review of the Superior Court's rules, both civil and criminal finds no rule, except civil rule 43(a) concerning offers of proof, governing the recordation of proceedings before the Court. In that this issue is being repeatedly raised before this Court and causes this Court great concern we hereby direct that the Superior Court promulgate a Rule, applicable in both civil and criminal proceedings in that Court, to overcome this glaring deficiency.

For the above stated reasons the judgment of the Superior Court is

\* \* \*

AFFIRMED.