**James TRABAUDO and Jean Ann Trabaudo, Plaintiffs,**

v.

**KENTON RURITAN CLUB, INC., Gwaltney of Smithfield, Ltd., John S. Grady as administrator of the Estate of Patricia Smith, t/a Smyrna Meat Markets, K & H Provision Co., Defendants.**

Superior Court of Delaware, Kent County.

Submitted: June 25, 1986.
Decided: Aug. 26, 1986.

I. Barry Guerke and Bonnie M. Benson of Parkowski, Noble & Guerke, Dover, for plaintiffs.

James W. Semple and Francis J. Jones, Jr. of Morris, James, Hitchens & Williams, Wilmington, for defendant Kenton Ruritan Club, Inc.

B. Wilson Redfearn and Beth H. Christman of Tybout, Redfearn, Casarino & Pell, Wilmington, for defendant Smyrna Meat Markets.

RIDGELY, Judge.

The matter presently before the Court involves motions for summary judgment by defendants Kenton Ruritan Club, Inc. ("Kenton") and Smyrna Meat Market ("Meat Market") against plaintiffs, James and Jean Ann Trabaudo ("Mr. and Mrs. Trabaudo"). Mr. and Mrs. Trabaudo allege in this action that Mr. Trabaudo contracted trichinosis as a result of eating pork sausage made and sold by Kenton, which had previously purchased raw pork from Meat Market in order to make the sausage.

On March 18, 1982, Mrs. Trabaudo bought three pounds of pork sausage from a member of Kenton, a community organization in the practice of selling sausage to raise money for college scholarships. In order to transform the raw pork which it had purchased from Meat Market into pork sausage, Kenton seasoned it with herbs, ground it into sausage, and then sold the product in partially waxed meat paper, sealed with tape and bearing only a notation of the weight of the package.

Mrs. Trabaudo claims that on the morning of March 20, 1982, she made patties out of the pork sausage and cooked them in an electric skillet at 400° F, until the water in the skillet boiled away and the patties were brown. Approximately one and one-half hours later, Mr. Trabaudo consumed one pattie sandwich. Mr. Trabaudo became ill one week later and was hospitalized from April 8 to April 18, 1982. A diagnosis of trichinosis was subsequently confirmed, as was a high trichinae larvae count in both frozen and unfrozen samples of pork sausage taken from plaintiffs' home.

Plaintiffs contend that defendants were negligent in failing to inspect the pork for trichinae and in failing to warn them of the danger of eating raw pork and the methods available to render it safe. Additionally, plaintiffs claim that defendants breached an implied warranty of fitness and violated the Uniform Deceptive Trade Practices Act, 6 Del.C. §§ 2531–2536, by misrepresenting the pork sausage as being wholesome. Finally, plaintiffs assert that defendants' sale of "adulterated" food constituted a violation of the Pure Food and Drug Act, 16 Del.C. ch. 33.

Defendants respond that, as a matter of law, they possessed no duty to inspect the pork for trichinae nor to warn consumers of potential danger since it was common knowledge that proper cooking will destroy trichinae larvae. Defendants further submit that the only representation made was that the sausage was fit for human consumption if cooked properly, and they argue that fresh pork containing trichinae is not considered unwholesome or adulterated under Pure Food statutes.

I.

On a motion for summary judgment, the Court's function is to determine whether there are any genuine issues of material fact. If, after viewing the record in a light most favorable to the nonmoving party, the Court finds there are no genuine issues of material fact, summary judgment will be appropriate. *Pullman, Incorporated v. Phoenix Steel Corporation*, Del.Super., 304 A.2d 334 (1973); *Moore v. Sizemore*, Del.Supr., 405 A.2d 679 (1979).

The element of duty in a negligence action is generally considered to be an issue of law for the Court to decide. *O'Connor v. Diamond State Telephone Co.*, Del.Super., 503 A.2d 661 (1985). In resolving the question of whether sellers of raw pork have a duty to inspect for trichinae and to warn consumers of potential danger, courts have considered "whether the magnitude of

the risk of the retailers' or packers' not inspecting or treating fresh pork for destruction of trichinae justifies the burden imposed by such an obligation." *Popour v. Holiday Food Center, Inc.*, Mich.App., 140 Mich.App. 616, 364 N.W.2d 764, 767 (1985).

A review of the record in this case, including the testimony of plaintiffs' expert, Dr. Leonard M. Pakman, reveals that no practical, effective method of inspection for trichinae has yet been developed and commonly employed in this country. Dr. Pakman noted that, because the microscopy test inspects only a small sample of the pork, any negative results "could provide a false sense of security." (Dr. Pakman's report, p. 9). The ELISA test recommended by Dr. Pakman only came to his attention in February 1985, and there is no indication in the record that it was utilized in this country or even developed as of 1982.

The only methods of treatment available in 1982 to rid fresh pork of trichinae were freezing and cooking to at least 137° F. The former method, however, precludes pork from being sold as fresh, and knowledge of the latter method has been deemed equally within the purview of the consumer as of the seller. *Hollinger v. Shoppers Paradise of New Jersey, Inc.*, N.J.Super., 134 N.J.Super. 328, 340 A.2d 687 (1975), *aff'd*, N.J.App.Div., 142 N.J.Super. 356, 361 A.2d 578 (1976); 2A Frumer & Friedman, *Products Liability*, § 25.04[2] (1976). Additionally, the Court notes that the number of reported cases of trichinosis in the United States each year is approximately 150, and that only one in 11,500 hogs that are examined are found to be infected with trichinae. (Dr. Pakman's report, p. 6); *Popour v. Holiday Food Center, Inc.*, supra.

■ I conclude that the burden which would be imposed by a seller's obligation to inspect and treat all pork for trichinae is not justified by the relatively small risk to the consumer of contracting trichinosis, particularly when proper cooking will eliminate that risk. Nor should sellers be re-quired to warn consumers of the necessity for proper cooking when the need for such is common knowledge. *Huebner v. Hunter Packing Co.*, Ill.App., 59 Ill.App.3d 563, 16 Ill.Dec. 766, 375 N.E.2d 873 (1978); 96 A.L.R.3d, § 2(a). As noted in *Hollinger v. Shoppers Paradise of New Jersey, Inc.*, 361 A.2d at 578–579:

"It is a scientific fact that the thorough cooking of a pork product to a temperature of 137° F kills trichinae … The overwhelming majority of cooks routinely cook pork thoroughly, notwithstanding their lack of knowledge of the "magical" 137° F. Considering the fact that the boiling point of water is 212° F, it is readily apparent that this minimum cooking requirement for pork is not too stringent. We deem the approach to this problem as expressed in *Nicketta v. National Tea Co.*, 338 Ill.App. 159, 87 N.E.2d 30 (App.Ct.1949), to be consistent with universal common knowledge of the propensities of pork as well as being the fairer and more sensible rule."

The case relied upon by plaintiffs in support of the proposition that such duties exist, *Clouser v. Shamokin Packing Company*, Pa.Super., 240 Pa.Super. 268, 361 A.2d 836 (1976), is dissimilar to the one at bar in that the plaintiff in that case contracted trichinosis after eating sausage in a restaurant. Unlike the present case, where it could be expected the consumer would properly cook the sausage, the passive consumer in *Clouser* had no control over the preparation of the sausage and was justified in relying on the defendants to ensure that either the sausage would be inspected for trichinae or cooked properly to remove trichinae.

■ Federal regulations provide that fresh pork does not need to be treated for destruction of trichinae since fresh pork is customarily well-cooked before serving. 9 C.F.R. § 318.10(a) (1985). Nonetheless, plaintiffs also assert that 9 C.F.R. § 318.-10(b) (1985) imposes a duty upon sellers of raw pork shoulder butts to ensure that they are "effectively heated, refrigerated,

or cured to destroy any possible live trichinae ...". Such duty does not apply to the present case. Assuming *arguendo* that plaintiffs purchased pork shoulder butts, section 318.10(b) provides that the above methods of treatment need not be applied unless the pork shoulder butts are sold "in casings or other containers in which ready-to-eat delicatessen articles are customarily enclosed." The catch-all phrase at the end of this paragraph (b) also imposes the duty for "other products consisting of mixtures of pork and other ingredients, which the administrator determines at the time the labeling for the product ... would be prepared in such a manner that the product might be eaten raw or without thorough cooking because of the appearances of the finished product or otherwise." This modifying language makes it clear that section 318.10(b) applies to products which customarily may not be well-cooked before serving and not to the sausage in issue here. Moreover, the marketing of the pork sausage in partially waxed meat paper sealed only with tape does not constitute a "casing" or "container" in which "ready-to-eat delicatessen articles are customarily enclosed." *See Scheller v. Wilson Certified Foods, Inc.*, Ariz.App., 114 Ariz. 159, 559 P.2d 1074 (1976).

## II.

■ Plaintiffs' claim of breach of an implied warranty of fitness must also be dismissed as a matter of law because the scope of the warranty given by a seller of fresh pork is that the product is fit for its ordinary and intended purpose—eating after proper cooking. There is no indication here that the pork was unfit for cooking or that it was "unreasonably dangerous" as that term is used at Restatement (Second) of Torts § 402(a), comment (i) (1965). *Huebner v. Hunter Packing Co., supra.*

## III.

■ Addressing plaintiffs' contention that sale of the trichinae-infested pork sausage constituted a violation of the Pure Food and Drug Act, 16 *Del.C.* ch. 33, because the pork was "adulterated" under section 3304(6) *; again, the Court must dismiss plaintiffs' claim as a matter of law. The majority interpretation of nearly identical statutes in other jurisdictions is that they do not encompass the sale of fresh pork. *Scheller v. Wilson Certified Foods, Inc., supra;* 2A Frumer & Friedman, *Products Liability* § 25.04[2] (1976). As one court stated in rejecting a similar claim, "[w]e cannot hold that the legislature intended to impose upon the producer the absolute civil responsibility of an insurer in cases where every reasonable means designed to guarantee the safety of food for normal uses has been employed." *Popour v. Holiday Foods Center, Inc., supra* at 766 quoting *Cheli v. Cudahay Brothers, Co.*, Mich.Supr., 267 Mich. 690, 255 N.W. 414, 415 (1934). Since there has been no showing that defendants' conduct fell short of the "every reasonable means" standard, and because plaintiffs were aware of the necessity of proper cooking, to define the pork sold in this case as "adulterated" under section 3304(6) would be to transfer defendants' status to that of insurers.

## IV.

■ Finally, plaintiffs do not have a cause of action for damages under the Uniform Deceptive Trade Practices Act, 6 *Del.C.* §§ 2531–2536. Under the Act, a remedy for damages may be available to one who has a business or trade interest at stake, but not to a mere consumer. *Pack & Process, Inc. v. Celotex Corp.*, Del.Super., 503 A.2d 646, 649 n. 1 (1985).

* 16 *Del.C.* § 3304 provides in part:
   "Food is deemed to be adulterated:
   　　*　　*　　*　　*　　*　　*
   "(6) If it consists in whole or in part of a filthly, decomposed or putrid animal or vegetable substance or any portion of an animal unfit for food, whether manufactured or not, or if it is the product of a deceased animal or one that has died otherwise than by slaughter."

Even when the record is viewed in a light most favorable to plaintiffs, this Court must conclude that there exists no material issues of fact sufficient to preclude summary judgment. Accordingly, defendants' motions for summary judgment are granted.

IT IS SO ORDERED.