Arthur J. CRAIG, Administrator of the Estate of Linda May Craig, Deceased, Arthur J. Craig, in his own right, Arthur J. Craig, as next friend of Arthur J. Craig, Jr., Linda May Craig, and Jack Craig, Plaintiffs,

v.

A.A.R. REALTY CORP., Tri–State Mall Associates, The Tri–State Mall Merchants Association, Inc. and Tri–State Security Systems, Defendants.

Civ. A. No. 83C–SE–69.

Superior Court of Delaware,
New Castle County.

Submitted Sept. 26, 1988.
Decided May 2, 1989.

---

John A. Elzufon, Elzufon & Associates, P.A., Wilmington, for plaintiffs.

Richard P.S. Hannum, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for defendants.

POPPITI, Judge.

This is a survival and wrongful death action seeking both compensatory and punitive damages as a result of the death by murder of Linda May Craig following her alleged abduction from the Tri–State Mall and her later rape. The Defendant Tri–State Mall Associates an unincorporated association ("TMA") owns both the land and building known as the Tri–State Mall Complex ("Mall") located on Naamans Road near the intersection of that road with Interstate I–95, New Castle County, Delaware. TMA is part of a large real estate conglomerate known as the Le Frak Organization headquartered in New York City. The Defendant A.A.R. Realty Corp. ("A.A.R.") leased the premises from TMA. The Defendant Tri–State Mall Merchants Association ("Association") is an association of the merchants who conducted their businesses at the Mall. The Association had some responsibility regarding Mall security.

The matter is presently before the Court on TMA's motion for summary judgment and on A.A.R.'s motion for partial summary judgment on the issue of punitive damages.

The record consists of the pleadings, answers to propounded discovery and various affidavits filed with regard to the pending motions.

In order to prevail on a motion for summary judgment, the moving party must show that no genuine issue of material fact exists, *Norse Petroleum A/S v. LVO Int'l., Inc.*, Del.Super., 389 A.2d 771 (1978), and that he/she is entitled to judgment as a matter of law. *Bradford, Inc. v. Travelers Indem. Co.*, Del.Super., 301 A.2d 519 (1972). In considering a motion for summary judgment, the facts must be viewed in a light most favorable to the non-moving party. *Shultz v. Delaware Trust Co.*, Del. Super., 360 A.2d 576 (1976).

The following recited facts are either undisputed or are taken in a light most favorable to the non-moving Plaintiffs. Linda Craig was employed as a salesperson for one of the kiosks set up in the upstairs common area of the Mall during the Christmas season. Upon leaving work at about 4:05 p.m. on December 15, 1981, she was kidnapped in the Mall parking lot and transported to Pennsylvania where she was raped and murdered. Although there were no witnesses to the crimes, Nicholas Yarris was subsequently tried and convicted of the offenses.

At the time of the incident A.A.R.'s leasehold interest beginning August 16, 1971 ran for 25 years. Pursuant to the terms of the lease A.A.R. "has been and will be in exclusive possession and control of the demised premises during the term of this lease." TMA receives a fixed annual rental of $268,750 plus 20% of the rentals to the merchants' sublessees.

At some time prior to the incident, Mall security was contracted for by the Association which paid for 75% of the cost, the 25% balance being paid for by A.A.R. At all times relevant hereto Mall security was conducted by two off-duty police officers. One officer patrolled the Mall building while the other patrolled the parking lot. The security detail did not commence each day until between 6:00 or 6:30 p.m.

Although all representatives of each named Defendant stated in deposition that they were unaware of any crimes of a similar nature having been committed at the Mall in the recent past, statistics from the Delaware State Police reveal that between January 1, 1978 to December 15, 1981 the following violent crimes against persons were committed at the Mall: 1 Homicide, 3 Kidnappings (1 sexual assault related), 13 Robberies, 49 Assaults, 4 Indecent Exposures, 3 Possession of Weapon Offenses. Further evaluation of the proffered data reveals that in the intervening 1,445 days between January 1, 1978 to De-

cember 15, 1981 crimes were committed at the Mall on 900 of the days and 1,487 reports were issued during the period.

TMA contends that it had nothing to do with Mall security nor did it have any responsibility for same. According to the deposition testimony of TMA's representative Maxwell Goldpin ("Goldpin"), TMA's interest was limited to "the tenancy and condition of the Mall as well as income and expenses." Consequently, Goldpin, acting on behalf of TMA, visited the Mall two or three times a year to inspect the Mall's physical appearance and monitor the tenancies. His written reports to A.A.R. in this regard include discussion of the following matters: general Mall cleanliness, roof leaks, parking lot stripe painting, air conditioning, 11% unemployment rate in August 1975, status of various leases, quality of films being shown at the movie theatre, and competition in the area. Not until after the incident in question did Goldpin make any reference to Mall security when in correspondence to A.A.R. dated January 16, 1985 he stated, "The tenants that I spoke to all seem to have the same complaint: Security, Security. Perhaps they can be induced to obtaining additional personnel." [1]

Goldpin asserts that there was no discussion of security with A.A.R. because he maintains that TMA left Mall management, which included security, to A.A.R.[2] When queried why he never checked to determine whether security was adequate, Goldpin responded that, to his knowledge, no security problem existed, although he admitted never undertaking an investigation of the crime situation at the Mall. Further, Goldpin assumed, without inquiring, the following regarding A.A.R.'s handling of Mall security: that the Association and A.A.R. would cooperate to decide security matters; that A.A.R. was actively involved in obtaining security; that the bulk of the expenses for security was paid by the Association; and that the Association and A.A.R. periodically reviewed security procedures to assure their adequacy.

With respect to A.A.R., discovery reveals the Mall is the largest project managed by A.A.R. The daily operations were handled by Marian Luff ("Luff"), A.A.R.'s on-site manager, who had no background in security matters and no authority to act with regard to security matters without clearance from A.A.R.'s New York headquarters. The security procedures developed by the Association were not periodically reviewed by A.A.R. No one in authority at A.A.R., particularly Abner or Jonathan Rosen, Chief Executive Officer and Vice–President respectively, familiarized themselves with Mall security. No one at A.A.R. knew that the Mall was completely without security prior to 6:00 p.m. Instead, A.A.R. relied solely on the Association for security except for the 25% payment obligation. On at least two occasions prior to the December 15 incident, Luff called A.A.R. headquarters to pass along the Association's concerns about security. According to Luff, she was told A.A.R. did not become involved with security matters. Due to A.A.R.'s policy of not being involved with Mall security, Luff avoided discussion of security at Association meetings which she regularly attended.

### I. *Duty of TMA*

■ In conjunction with TMA's application for summary judgment, I am asked to

---

**1.** Delaware Rule of Evidence 407 precludes the introduction of evidence of postremedial measures to prove culpable conduct unless the evidence is offered for another purpose. I am satisfied that the referenced correspondence is relevant to the issue of control and may properly be considered as part of the record for purposes of deciding the questions presented on summary judgment.

**2.** I am mindful that Anthony N. Potter, Jr., CPP, CST, an expert retained by the Plaintiff, has stated that in his experience as a security consultant, he is aware that many shopping centers are owned by entities that take no part at all in the management of their properties, but rather rely on separate and independent management companies to operate the centers. He also represents that owners who take no active part in the management of their properties will from time to time conduct independent audits of all management functions, including security of properties owned by them. There is no evidence in this record to suggest that a security audit of any type was ever conducted.

decide whether a non-possessory landowner owes a duty of care to protect business invitees[3] of its tenants from the criminal acts of third parties. The element of duty in an action for negligence is usually considered to be an issue of law for the court to determine. *Trabaudo v. Kenton Ruritan Club, Inc.*, Del.Super., 517 A.2d 706, 707 (1986); *O'Connor v. Diamond State Telephone Co.*, Del.Super., 503 A.2d 661, 663 (1985); *Carpenter v. O'Day, et al.*, Del.Super., 562 A.2d 595 (1988); *Furek v. University of Delaware, et al.*, Del.Super., C.A. No. 82–SE–30, Poppiti, J. (December 23, 1987). Further, the determination of whether the interest of a Plaintiff which has suffered invasion is entitled to legal protection is frequently an expression by the court of evolving public policy. W. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on Torts* (5th ed. 1984) at 356–359; *Carpenter, supra* at 600–01; *Furek, supra* at 9; *DiOssi v. C. Ronald Maroney, et al.*, Del.Supr., 548 A.2d 1361 (1988). In short, the recognition that a duty exists is "... only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Prosser and Keeton, supra* at 358. It may be observed then that:

> ... the courts have merely 'reacted to the situation in the way in which the great mass of mankind customarily react,' and that as our ideas of human relations change the law as to duties changes with them. Various factors undoubtedly have been given conscious or unconscious weight, including convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, the moral blame attached to the wrongdoer, and many others. Changing social conditions lead constantly to the recognition of new duties. No better general statement can be made than that the courts will find a duty where, in general, reasonable per-

sons could recognize it and agree that it exists.

*Prosser and Keeton, supra* at 354.

At common law a property owner owed an affirmative duty to protect a business invitee from reasonably foreseeable dangers on the premises. *Hamm v. Ramunno*, Del.Supr., 281 A.2d 601 (1971); *Prosser and Keeton on Torts, supra* at 419. Under the common law this duty extended to the acts of third parties. In the language of the *Restatement (Second) of Torts* § 344:

> A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to (a) discover that such acts are being done or are likely to be done, or (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

Comment f to § 344 in pertinent part reads as follows:

> [The possessor of land] may ... know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.

These principles were recently recognized in the case of *Jardel Co., Inc. v. Hughes*, Del.Supr., 523 A.2d 518 (1987)

---

**3.** All parties agree that the decedent is properly characterized as a business invitee for purposes of this litigation.

where the Supreme Court affirmed the judgment of the Superior Court for compensatory damages against a mall owner and operator. In *Jardel* the jury determined that Plaintiff's injuries were proximately caused by negligently failing to provide adequate security in the mall parking lot. The Court stated as follows:

> We conclude that while a property owner is no more an insurer or guarantor of public safety than are police agencies, there is a residual obligation of reasonable care to protect business invitees from the acts of third persons. We adopt the Restatement standard, which approves the concept that incidents of criminal activity provide a duty to foresee specific criminal conduct. Whether the conduct of a particular owner meets the standard of reasonable care is, of course, a matter for jury determination.

*Id.* at 525.

In reaching this conclusion I am mindful that the Court used the phrase "property owner" suggesting perhaps a class of defendants broader than "possessors of land." I am also mindful that the Defendants were the owners in possession/management of the mall, as well as the owner's parent corporation which approved a security plan established by the owner/manager. Finally, I am mindful that the Court recognized to some extent the unique problems regarding security posed by "large shopping malls [which] are a commonplace part of modern commercial life." [4] *Jardel, supra* at 525.

Predicated on the principles of premises liability and coupled with a cost-benefit analysis, a number of courts have recognized that special conditions connected with the ownership and operation of a mall which lend themselves to criminal activity may require that a duty of care devolve upon the mall owner who is in the best position to take action and distribute the cost. One commentator explained the analysis as follows:

> [O]f all the involved parties, the cost of crime reduction is cheapest to the landowner. For the criminal, imposing civil liability on him in addition to existing criminal sanctions does not deter him from committing the crime. Imposing duty on the patron, so that he must protect and compensate himself, may result in crime reduction, but only at the expensive cost of the patron staying home. While the patron can prevent crime by not going out at night, the price of staying home is high not only for him but also for society in general. As opposed to the transient patron, who has little information about the crime problem on the landowner's premises and little ability to directly influence it, the landowner can be much more effective in dealing with the problem. While the patron holds just one expensive option, staying home, the landowner holds many options, ranging from installation of better lighting, fences, or guard service, to even varying hours of operation. All of these options should be less expensive and much more effective in deterring crime than the patron's sole choice of staying home.

Bazyler, *The Duty to Provide Adequate Protection: Landowners' Liability for Failure To Protect Patrons from Criminal Attack*, 21 Ariz.L.Rev. 727, 747–48

---

4. An article in a legal publication described the backdrop against which the issue is framed as follows:

> The United States in the last fifteen to twenty years has been undergoing a drastic change in the method of providing retail outlets. Merchants have been on the move from the downtown area with several blocks of large stores and public parking to shopping centers and enclosed malls with sizable private parking lots. As the means of merchandising has changed to shopping centers and malls with attendant private parking, the common law concerning the business property owner's liability to his customers for personal injury by criminal attacks on business customers in the parking lots has also been undergoing drastic change. As Justice Henry stated in *Cornpropst v. Sloan* [528 S.W.2d 188 (1975)]: 'The modern phenomenon of merchandising and marketing through community shopping centers has opened a new vista into the concept of tort liability of the owners, occupiers or possessors of business premises.' Cherry, *Liability of Business Property Owners for Injury to Customers in Parking Lots by Criminal Attacks From Third Parties,* 13 Real Estate L.J. 141 (1981).

(1979); *See also Taylor v. Centennial Bowl, Inc.,* 65 Cal.2d 114, 52 Cal.Rptr. 561, 416 P.2d 793 (1966) (Owner-operator of a bowling alley had duty to protect business invitees from criminal acts of third persons consistent with *Restatement (Second) of Torts* § 344.); *Rotbart v. Jordan Marsh Co.,* Fla.App.Dist. 3, 305 So.2d 255 (1974) (Owner-operator of a department store had duty to protect business invitee from criminal acts of third persons which could reasonably be foreseen and guarded against.); *Foster v. Winston–Salem Joint Venture,* 303 N.C. 636, 281 S.E.2d 36 (1981) (Customer assaulted in mall parking lot stated a cause of action in negligence against mall owner because criminal attacks in the lot were reasonably foreseeable.); *Atamian v. Supermarkets General Corp.,* 146 N.J.Super. 149, 369 A.2d 38 (1976) (Question as to whether owner out of possession as well as lessee operator of a supermarket discharged their duty to take reasonable security measures for the protection of their patrons ruled to be a jury question. A review of the Court's opinion does not reveal any facts concerning the degree of participation or retention of control by the owner/landlord in the day-to-day operation of the business.); *Morgan v. Bucks Associates,* 428 F.Supp. 546 (E.D.Pa.1977) (Applying the common law of the Commonwealth of Pennsylvania regarding landlord and tenant the Court held that where the owner of real estate leases parts thereof to several tenants, but retains possession and control of the common areas which are to be used by business invitees of the various tenants, the obligation to keep those areas safe for the business invitees is imposed upon the owner/landlord in the absence of a contrary provision in the lease.); *Drake v. Sun Bank & Trust Co. of St. Petersburg,* Fla.App.Dist. 2, 377 So.2d 1013 (1979), *rev'd on rehearing,* Fla.App., 400 So.2d 569 (1981) (Amended complaint alleging similar crimes in the area stated a cause of action against a bank for negligence in an action brought by the widow of a man kidnapped from the bank's parking lot and later murdered.); *Walkoviak v. Hilton Hotels Corp.,* Tex.Civ.App., 580 S.W.2d 623 (1979) (Criminal acts by third persons against hotel patron in the hotel's parking lot created an issue of fact for the jury as to whether the criminal acts were an intervening cause.); *See generally,* Note, Duty of Mall Owners To Take Measures to Protect Invitees from Criminal Acts, 60 N.C.L. Rev. 1126 (1982). McNiece, Thornton, *Affirmative Duties in Tort,* 58 Yale L.J. 1272 (1949).

■ Balanced against the compelling policy reasons for establishing a duty upon the premises owner is the well established common law principle that a landlord who has neither possession nor control of the leased premises is not liable for injuries to third persons. Thompson, *Commentaries on the Modern Law of Real Property,* § 1241, p. 243 (1981); *Prosser and Keeton, supra* at 434. This concept is summarized in the *Restatement (Second) of Torts* § 355:

> [A] lessor of land is not subject to liability to his lessee or others upon the land with the consent of the lessee or sublessee for physical harm caused by any dangerous condition which comes into existence after the lessee has taken possession.

An exception arises when the lessor retains control of portions of the land which the lessee is entitled to use. *Restatement (Second) of Torts* § 360. *See e.g., Leary v. Lawrence Sales Corp.,* 442 Pa. 389, 275 A.2d 32 (1971) (Landlord who retained possession of common areas had duty to keep the premises safe.).

Many jurisdictions faced with the issue at bar have held that a landowner/landlord does not have a duty to protect lessee's employees or customers from criminal attacks once the premises have been transferred to the lessee without any retention of control. *See generally Rowe v. State Bank of Lombard,* 125 Ill.2d 203, 126 Ill. Dec. 519, 531 N.E.2d 1358 (1988) (Determination of a duty on the part of a landlord/lessor to protect employees of a tenant from criminal attacks by third persons depends on whether the landlord/lessor has retained control of the premises.); *Latham v. Aronov Realty Co.,* Ala.Supr., 435 So.2d 209 (1983) (Summary judgment in favor of

defendant mall owners and rental agent affirmed in action by employee of mall tenant for injuries sustained from assault in a parking lot on the basis that such an attack was not reasonably foreseeable.); *Martinko v. H–N–W Associates,* Iowa Supr., 393 N.W.2d 320 (1986) (Applying § 344 of the *Restatement (Second) of Torts,* the Court determined that mall owners and operators in control owed no duty to provide security services to customers murdered in the mall parking lot during open hours for the reason that a possessor of land is under no duty of protection unless he/she can reasonably anticipate the criminal activity.); *Pagano v. Mesirow,* 147 Mich.App. 51, 383 N.W.2d 103 (1985) (Owner and manager of shopping center had no duty to provide security over portions of premises leased to others because they did not exercise control over the security of the leased premises.); *Williams v. City of Detroit,* 127 Mich.App. 464, 339 N.W.2d 215 (1983) (City held not liable for negligence of security service hired by lessee of arena who had exclusive possession and control of the premises when shooting occurred at an auto show.); *Trice v. Chicago Housing Authority,* 14 Ill.App.3d 97, 302 N.E.2d 207 (1973) (Landlord had no duty to protect tenants from criminal acts of others unless landlord exercises control over the premises and could reasonably discover and make safe the dangerous condition.); *Faheen by Hebron v. City Parking Corp.,* Mo.App., 734 S.W.2d 270 (1987) (Parking garage owners in control had no duty under the landlord-tenant relationship to protect a tenant against a car bombing in the garage because prior crimes in the vicinity were not of the type to place the owners on notice of the criminal activity.); *Daily v. K–Mart Corp.,* 9 Ohio Misc.2d 1, 458 N.E.2d 471 (1981) (Landlord not in control of the premises held not liable to business

invitee attacked in parking lot.); Sykes, *The Boundaries of Vicarious Liability: An Economic Analysis of the Scope of Employment Rule and Related Legal Doctrines,* 101 Harv.L.Rev. 563 (1988) (Imposition of vicarious liability on premises owners for intentional torts committed by intruders is based on a negligence standard.); Zacharias, *The Politics of Torts,* 95 Yale L.J. 698 (1986) (discussing the political effects of establishing liability on premises owners); Browder, *The Taming of a Duty—The Tort Liability of Landlords,* 81 Mich.L.Rev. 99 (1982) (modern exceptions to the control theory).

The traditional test for the determining liability of a landowner/landlord to third party business-invitees for injuries sustained on the premises is, therefore, whether the landowner/landlord had control of the premises. *See Hanko v. United States,* 583 F.Supp. 1280 (W.D.Pa.1984). 5 F. Harper, F. James and O. Gray, *The Law of Torts,* § 27.16 at 271 (2d ed. 1986). Control in the context of the duty owed by a landlord means the "authority to manage, direct, superintend, restrict or regulate." *Kirby v. Zlotnick,* 160 Conn. 341, 278 A.2d 822, 824 (1971).

 In Delaware, the imposition of a duty upon the landowner/landlord requires "actual control" of the premises. *Monroe Park Apartments Corp. v. Bennett,* Del. Supr., 232 A.2d 105, 108 (1967).[5] Neither the right to inspect the premises by the landlord, *Blair v. Berlo Vending Corp.,* Del.Super., 287 A.2d 696, 697 (1972); *Grochowski v. Stewart,* Del.Super., 169 A.2d 14 (1961), nor the reservation of a right to inspect coupled with a right to retake control under certain circumstances amounts to control. *Williams v. Cantera,* Del.Super., 274 A.2d 698, 701 (1971); *See also Weiss v. Wilkins,* Del.Super., 313 A.2d 897 (1973) (Oil company not liable to service

**5.** While I am mindful that other jurisdictions have taken an approach different from the traditional concept of control under common law landlord-tenant principles, *Sargent v. Ross,* 113 N.H. 388, 308 A.2d 528 (1973) (Control is not a prerequisite to the determination of a duty of the landlord to provide safe premises but, rather, is a factor in deciding whether the landlord exercised due care under the circumstances.);

*Kline v. 1500 Massachusetts Avenue Apartment Corp.,* 439 F.2d 477 (D.C.Cir.1970) (Landlord had a duty to protect tenants from criminal attacks on premises within the landlord's control on the basis of public policy and contract principles.), I am convinced that the determination of a duty on the landlord in Delaware depends upon the principle of actual control as declared in *Monroe supra.*

station customer bitten by a dog at the station, even though company representatives regularly inspected the premises for safety and attempted to remove the dog because it created a dangerous condition, for the reason that the service station operator had control of the premises.).

In light of the precedent in this state which requires actual control by the landowner/landlord, I am satisfied that to impose a duty on a non-possessory landowner/landlord to protect business invitees of its tenants from criminal attacks the non-possessing landowner/landlord must exercise control which amounts to actual management of the leased premises. While I am mindful that the modern shopping mall which attracts criminal activity may warrant the imposition of a duty upon the non-possessing mall owner who retains no control because such an owner is arguably in the best position to take preventative measures and, therefore, allocate the costs, the decision to change common law landlord-tenant principles rests with the legislature and not with the courts. *See McGraw v. Corrin*, Del.Supr., 303 A.2d 641, 644 (1973).

Applying these principles to the present case, it is undisputed that TMA had a long-term lease with A.A.R. which devolved exclusive possession of the Mall upon A.A.R. Further, A.A.R. was charged with management responsibilities under the lease. The deposition testimony of TMA's representative, Maxwell Goldpin, revealed that TMA left Mall security matters to A.A.R. There were no discussions between A.A.R. and TMA about security. While Goldpin made two or three visits per year to the Mall to inspect physical appearance and monitor tenancy, the letters written by Goldpin between March 28, 1974 and May 18, 1979 concerning these visits show that the purpose of the inspections was not to arrange security measures but rather to report on the outward physical appearance of the Mall, vacancies existing in the Mall, promotional activities and maintenance problems. Despite the reversionary interest retained by TMA and TMA's right to inspect the premises, I am satisfied that

these actions on behalf of TMA do not constitute the actual control necessary in order to hold that a duty exists to protect business invitees of A.A.R.'s tenants from criminal attack. *See Monroe Park Corp., supra* at 108.

Further, I am convinced that Goldpin's letter of January, 1985 to A.A.R. did not place TMA in the position of controlling security at the Mall. This letter expressed TMA's concern regarding security based on Goldpin's discussions with merchants during an inspection visit. The letter also suggested that the merchants may be persuaded to hire additional security personnel. Considering the letter in a light most favorable to the Plaintiffs, Goldpin's comments relating to security at the Mall do not rise to the level of "actual control" necessary to impose a duty to prevent foreseeable criminal attacks upon the non-possessing landowner.

Moreover, the fact that TMA received a fixed annual rental under the lease in conjunction with a percentage of the rentals to sublessees does not constitute "actual control." I am satisfied that an economic benefit standing alone will not be sufficient to create a duty on behalf of the non-possessing landlord where the record otherwise lacks evidence of control.

Plaintiffs contend that even though TMA may have no direct duty to protect invitees at the Mall, there is an affirmative duty based on the "special relationship" of the parties. There are circumstances when the special relation between parties gives rise to a duty. Compare *Murphy v. Godwin*, Del.Super., 303 A.2d 668 (1973) (doctor/patient relationship gives rise to a duty) with *Furek v. University of Delaware*, Del.Super., C.A. No. 82C–SE–30, Poppiti, J. (Dec. 23, 1987) (student/university relationship found not to be a special relationship). *Restatement of Torts (Second)* § 314A lists special relations which give rise to a duty of protection:

(1) A common carrier is under a duty to its passengers to take reasonable action (a) to protect them against unreasonable risk of physical harm, and

(b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.

(2) An innkeeper is under a similar duty to his guests.

(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.

(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

I find no special relationship to exist in the matter *sub judice.*

Plaintiffs further contend that TMA has voluntarily assumed the duty to protect invitees at the Mall. They point to *Jardel* in which the possessor of a Mall voluntarily undertook a security program. Here, the non-possessory landlord did not undertake security of the Mall. Rather, TMA left security matters to A.A.R., the Mall managers. While it is true that TMA's representative visited the Mall two or three times per year, these visits did not involve security. Instead, the record is undisputed that the visits focused on aesthetic conditions and tenant occupancy. On this record, therefore, there is no evidence that TMA assumed a duty to protect business invitees at the Mall.

A final contention of Plaintiffs is that the owner of the land has a "non-delegable duty" to make the premises safe. In this regard they rely on the case of *Rowley v. City of Baltimore*, 305 Md. 456, 505 A.2d 494 (1986) in which the City, owner of a convention center, was found not liable to the employee of an independent contractor that managed the center who was raped and beaten while performing her duties as a security guard. I am satisfied that *Rowley* is not apposite here because it is a possession/control case. *Id.*, 505 A.2d at 498. The Court found that the City retained possession of the center since there was no provision in the lease giving the independent contractor exclusive posses-

sion but denied recovery to the employee on the ground that employees of independent contractors are not within the class to which the employer owes a non-delegable duty. *Id.* at 498–500. *Rowley* does not, therefore, stand for the proposition that a non-possessing landowner owes a duty to protect business invitees on leased premises.

Having stated the above, I conclude that TMA owed no duty of care to Linda Craig. TMA's Motion for Summary Judgment is, therefore, HEREBY GRANTED.

## II. *Punitive Damages against A.A.R.*

▮▮▮ Ordinarily, the determination of the punitive damages issue is for the trier of fact. *Eustice v. Rupert*, Del.Supr., 460 A.2d 507, 509 (1983). In this regard, as the trial judge, I must submit the issue to the jury where a reasonable inference justifying punitive damages can be drawn from the facts. The underlying purpose of punitive damages is to punish outrageous conduct and deter such conduct in the future. *Restatement (Second) of Torts* § 908 (1977). Outrageous conduct warrants punitive damages because of "the defendant's evil motive or his reckless indifference to the rights of others." *Id.* The concept of "reckless indifference" comprises both an act such as the decision to provide only limited security and a state of mind such that the harm was "reasonably apparent but consciously ignored." *Jardel, supra* at 530–31. Essentially, conscious indifference amounts to an "I don't care" attitude. *Cloroben Chemical Corp. v. Comegys*, Del. Supr., 464 A.2d 887, 891 (1983) citing *Eustice*, 460 A.2d at 509. Moreover, an economic decision can be the basis for punitive damages if the cost is weighed intentionally against a "perceived risk" that includes the same type of harm which actually occurred. *Jardel, supra* at 531; *See also Cloroben*, 464 A.2d at 891–92.

In *Jardel, supra*, the Delaware Supreme Court found that the issue of punitive damages should not have been submitted to the jury when a possessory mall owner failed to provide adequate security which proximately caused the kidnapping and rape of an employee of one the stores located in

the mall. While recognizing that punitive damages may be available under certain circumstances the Court reasoned that the occurrence of no similar incidents to put the owners on notice coupled with failure to place an additional guard because of an economic decision constituted mere negligence insufficient to justify punitive damages. The Court stated as follows:

> An economic decision may be the basis for punitive damages, however, only if the economic cost is intentionally weighed against a perceived risk which includes the reasonable likelihood of the harm which occurred. *Cloroben*, 464 A.2d at 891–892; *Grimshaw v. Ford Motor Co.*, Cal.App., 119 Cal.App.3d 757, 810–816, 174 Cal.Rptr. 348, 382–386 (1981). Here, regardless of the basis of the decision to use [a certain sized security force], there was insufficient evidence to demonstrate the likelihood of the magnitude of the harm which followed.

*Jardel, supra* at 531.[6]

In conjunction with this holding the Court enunciated an arguably broad statement of policy which counsel for A.A.R. maintains would in effect preclude the imposition of punitive damages in any mall/shopping center cases of the nature *sub judice.* The policy is stated as follows:

> Finally, we note the complete absence of any deterrent basis for the imposition of punitive damages in this situation. Violent crime is an unfortunate fact of modern society. The primary responsibility for citizen protection is that of organized police agencies. While mercantile landlords should be encouraged to provide safe premises for their customers and employees, they should not be punished for mere inadequacy as a lesson to other landlords. As this case illustrates, a property owner's duty in this area of the law is not so precisely drawn that flagrant abuses can be easily identified and civilly punished. There is an obvious incentive on the part of every landowner to maintain safe premises, since it is in his own economic interest to do so. It is difficult to envision any large saving to be realized by the failure to employ moderately paid security personnel. We fail to see how the allowance of punitive damages in this case will advance the cost-benefit equation in this area.

*Jardel, supra* at 531.

While I am careful to apply the letter and spirit of the articulated policy I am quick to add that I do not read the *Jardel* language to mean that there can never be a case when the "conscious indifference" of a commercial landowner/landlord to the reasonably apparent precise harm which eventuates will raise a factual issue sufficient to submit the matter to the jury on the issue of punitive damages.

■ Applying these principles to the case at bar I am satisfied that taking all facts in a light most favorable to the non-moving Plaintiffs a juror could conclude that A.A.R. was reasonably on notice con-

---

**6.** While the Supreme Court used the word "intentionally" I am satisfied upon a review of the cited authority and the language of *Jardel* that the description of conduct for which punitive damages may be appropriate is more expansively described, namely intentional or malicious conduct or conduct which is consciously indifferent to the rights of others. The Court in *Jardel* at 529–30 stated as follows:

> The penal aspect and public policy considerations which justify the imposition of punitive damages require that they be imposed only after a close examination of whether the defendant's conduct is 'outrageous,' because of 'evil motive' or 'reckless indifference to the rights of others.' *Restatement (Second) of Torts* § 908, comment b (1979)....
>
> As noted above, the outrageous conduct may be the result of an evil motive or reckless indifference. In rough approximation, these terms parallel the willful and wanton standard of the guest statutes. Each refers to a distinct state of mind, one a conscious awareness, the other a conscious indifference.... We prefer the term 'reckless indifference' to the term 'wanton,' which has statutory roots now largely extinct.
>
> \* \* \* \* \* \*
>
> There is no contention here that Jardel's conduct was intentional or malicious. Its actions must therefore be tested under the standard of recklessness, i.e., a conscious indifference to the rights of others. When so measured it is clear that the evidence did not suffice for submission to the jury of the issue of punitive damages.

cerning crimes at the Mall, the nature of which approach the magnitude of kidnap, rape and murder. Indeed, I am satisfied that given the frequency and severity of reported crimes at the Mall between January 1, 1978 and December 15, 1981 a reasonable juror could conclude that a virtual crime wave existed.

Further, I am satisfied that taking all facts in a light most favorable to the non-moving Plaintiffs a reasonable juror could conclude that A.A.R. was consciously indifferent to the rights of others. In this regard I am mindful that despite the fact that under the lease A.A.R. controlled the premises, A.A.R. refused to become involved in security matters. Rather, A.A.R. allowed the Merchants Association to implement security measures. The only involvement of A.A.R. in security was a 25% contribution towards the expense of security. Further, Marian Luff, the on-site manager for A.A.R., contacted A.A.R. headquarters at least twice to express concerns about security. She was informed that A.A.R. was not involved with security. Further, A.A.R.'s policy on security caused her to consciously avoid discussion of security matters in meetings of the Merchants Association. Indeed I am satisfied that a reasonable juror could conclude that A.A.R.'s attitude regarding security, even measured against the precise harm that was reasonably apparent given the recited crime statistics was best evidenced in the deposition testimony of Jonathan Rosen, A.A.R. vice-president, when he stated:

Q. Changing gears again. Did you in your capacity as an officer of A.A.R. Realty ever cause to have routine reports come up to A.A.R. Realty on what the crime situation and the security situation was at the Tri–State Mall?

A. No.

Q. Why not?

A. It seems to me that the crime situation is a matter for the public security authorities and not for an individual owner of real estate. We have shopping centers in perhaps 25 states around the United States and my concern is for the wellbeing of the tenants, that they should pay their rent and be happy, and the crime statistics I will happily leave to the political authorities of the various entities within which the centers are located.

I conclude that a reasonable juror could determine that this is an attitude more consistent with conscious indifference than with mere inadequacy.

Having stated the above, I am satisfied that A.A.R.'s Motion for Partial Summary Judgment is, therefore, HEREBY DENIED.

IT IS SO ORDERED.