# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

JOHN DOE and JANE DOE,

        Plaintiffs,

        v.

SCOTT BICKING, CCB LAND
INVESTMENTS, LLC D/B/A THE
POND ICE ARENA and THE POND,
INC., RILEY COTE, HIGH
PERFORMANCE HOCKEY SKATE &
SKILL, LLC and THE PRO SHOP AT
THE POND, LLC,

        Defendants.

C.A. No. S14C-05-026   CAK

JANE DOE #2, guardian *ad litem* for
JOHN DOE #2, a minor, and
JANE DOE #2, individually,

        Plaintiffs,

        v.

SCOTT BICKING, CCB LAND
INVESTMENTS, LLC D/B/A THE
POND ICE ARENA and THE POND,
INC., RILEY COTE, HIGH
PERFORMANCE HOCKEY SKATE &
SKILL, LLC and THE PRO SHOP AT
THE POND, LLC,

        Defendants.

Submitted: October 28, 2019
Decided: January 22, 2020

*Upon Motions for Summary Judgment*

**CCB LAND INVESTMENTS, LLC's MOTION FOR SUMMARY
JUDGMENT**

**GRANTED**

**THE PRO SHOP AT THE POND, LLC's MOTION FOR SUMMARY
JUDGMENT (NEGLIGENT HIRING AND SUPERVISION)**

**DENIED**

**THE PRO SHOP AT THE POND, LLC's MOTION FOR SUMMARY
JUDGMENT *(RESPONDEAT SUPERIOR)***

**DENIED**

## MEMORANDUM OPINION AND ORDER

Raeann Warner, Esquire, Jacobs & Crumplar, P.A., 750 Shipyard Drive, Suite 200, Wilmington, DE 18901, Counsel for Plaintiffs.

Scott Bicking, 205 North Stockton Avenue, Wenonah, NJ 08090, Defendant.

CCB Land Investments, LLC d/b/a The Pond Ice Arena, Attention: Robert Campbell, 23 Ridgewood Turn, Newark, DE 19711, Defendant.

The Pond, Inc., Attention: Roberti Campbell, 101 John F. Campbell Drive, Newark, DE 19711, Defendant.

Christian J. Singlewald, Esquire, White and Williams LLP, 600 North King Street, Suite 800, Wilmington, DE 19801, Counsel for Defendants Riley Cote and High Performance Hockey Skate & Skill, LLC.

Nancy Chrissinger Cobb, Esquire, Law Offices of Chrissinger & Baumberger, 3 Mill Road, Suite 301, Wilmington, DE 19806, Counsel for Defendant The Pro Shop at The Pond, LLC.

1

**KARSNITZ, J.**

## BACKGROUND

This case arises out of alleged incidents which occurred at The Pond Ice Arena (the "Ice Arena") during the summer of 2013. Plaintiffs generally argue that CCB Land Investments, LLC d/b/a The Pond Ice Arena ("CCB")[1] and The Pro Shop at the Pond, LLC ("The Pro Shop"), *inter alia,* are liable for the alleged sexual abuse of two minor[2] Plaintiffs by Defendant Scott Bicking ("Bicking"). The original Complaint dates back to May 27, 2014, in which Plaintiffs Jane Doe, as guardian *ad litem* for John Doe, and Jane Doe, individually, alleged, *inter alia*, assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, and gross negligence by Defendants, and sought damages from Defendants. The Complaint has subsequently been amended several times and consolidated to include Jane Doe #2, as guardian *ad litem* for John Doe #2, and Jane Doe#2, individually, and additional Defendants. This Court stayed the civil case in October 2014, pending Bicking's criminal trial in this Court scheduled for November 2014. In June 2015, Bicking pled guilty to criminal charges,[3] and this Court lifted the stay. In July 2017, this Court moved the case to the bankruptcy docket for up to a 24-month period. In

---

[1] Neal J. Levitsky, Esquire, Seth A. Niederman, Esquire and Kasey H. DeSantis, Esquire, and the law firm of Fox Rothschild LLP, originally represented CCB. On November 15, 2019, I granted a Motion for Leave to Withdraw by these attorneys to withdraw from further representation of CCB.
[2] At the outset of this case, Plaintiff John Doe was a minor and was represented by his mother, Jane Doe, as guardian *ad litem*. John Doe has since reached the age of majority.
[3] Bicking has since completed his term of incarceration.

March 2018, the case was moved back to the civil docket from the bankruptcy docket. In September 2018, Commissioner Howard entered a Pretrial Scheduling Order, which scheduled a pretrial conference on February 3, 2020, and a jury trial commencing on March 2, 2020.

There are presently three Motions for Summary Judgment pending before me pursuant to Superior Court Civil Rule 56, one filed by CCB and two filed by The Pro Shop. CCB's July 24, 2019 Motion argues that it is not liable to Plaintiffs for the actions of Bicking as the landowner/landlord of The Pond Ice Arena under the law of premises liability and it is not liable to Plaintiffs for imputed negligence under principles of agency law.

One of The Pro Shop's August 2, 2019 Motions asserts that it is not liable for the actions of Bicking under the law of negligent hiring and negligent supervision of Bicking. The Pro Shop's other August 2, 2019 Motion asserts that it is not vicariously liable for the actions of Bicking under the law of *respondeat superior*.

On August 30, 2019, Plaintiffs filed a single Response in opposition to all three of Defendants' Motions. Plaintiffs, CCB and The Pro Shop have fully briefed their positions on these issues, and I held oral argument on October 28, 2019.

This is my ruling on these three Motions. For the reasons discussed more fully below, I grant CCB's Motion for Summary Judgment, and I deny both of The Pro Shop's Motions for Summary Judgment.

3

# FACTS

I am considering the alleged facts in a light most favorable to the Plaintiffs, the non-movant.

Bicking was originally employed in 1996 or 1997 by Power Play, a hockey supply store owned by Robert Sutherland, at the store's four New Jersey sites, including the Hollydel Ice Rink and the High Ridge Ice Arena. In 2001, he was terminated by these two stores for alleged inappropriate sexual contact with young boys.

CCB owns the land, the building on the land, and some of the equipment appurtenant thereto, collectively known as The Pond Ice Arena ("The Pond") at 101 John F. Campbell Drive, Newark, Delaware 19711. Beginning in 1996 and at all times pertinent hereto, CCB[4] leased the use of The Pond to The Pond, Inc., a Delaware corporation, which operates The Pond. CCB was not involved in the day-to-day operation of The Pond, the use of the facility by the paying public, the running of ice hockey and roller hockey camps, or the sale of merchandise. CCB is a commercial landlord with no employees and no purpose other than the ownership of the land and the improvements at The Pond. In 2006, Bicking became a minority owner of CCB[5]

---

[4] CCB is successor to B.S.B.B. ICE L.L.C., the original landlord.
[5] CCB is now held as follows: Robert Campbell (50 2/3%), Steve Campbell (33 1/3%, and Bicking (16%).

4

and a 50% owner of The Pond, Inc.[6] However, Bicking was not an agent or employee of CCB, had no supervisory or managerial role in CCB, and had no authority over the operation of CCB. Robert Campbell is the designated managing member of CCB.

In 2001, Bicking approached The Pond about leasing the pro shop at The Pond, which was then vacant, from The Pond, Inc. He and others formed The Pro Shop, LLC, a Delaware limited liability company ("The Pro Shop"), which operated stores in Sewell, New Jersey and at The Pond.[7] The Pro Shop leased the pro shop at The Pond from The Pond, Inc. The Pro Shop thereupon became a commercial subtenant of CCB. CCB, as was its obligation under §16.01 of the lease with The Pond, Inc., consented to this sublease. Bicking worked at The Pro Shop and paid himself a salary. Bicking variously worked in three places: The Pro Shop, The Pond, and his office at The Pond, ordering and selling hockey gear, providing skate sharpening and repair services, and coaching at High Performance summer hockey camps.

Plaintiffs allege that Bicking engaged in sexual improprieties with young boys, some of whom worked in The Pro Shop, in all three places; however, the Plaintiffs in the case *sub judice* allege that Bicking's abuse of them took place in his office at The Pond, not in The Pro Shop. Plaintiffs allege that Bicking's actions were frequent, open and notorious. The Pro Shop had no policies of any kind, including policies related to

---

[6] The other 50% of The Pond, Inc. is owned by Robert Campbell.
[7] By the year 2013, Bicking owned 50% of The Pro Shop and Robert Campbell owned 50% of The Pro Shop.

5

sexual abuse prevention or detection.

Plaintiffs allege that Robert Campbell, both as majority owner of CCB and as a 50% owner of both The Pond, Inc. and The Pro Shop, was aware of Bicking's prior employment by Robert Sutherland and Power Play, and the reasons for the termination of that employment. However, neither Campbell, CCB nor The Pro Shop contacted the previous employer about this. The record reflects that, if asked, Sutherland and Power Play would have disclosed this information to CCB and The Pro Shop.

## SUMMARY JUDGMENT

### Standard of Review

Summary judgment for a movant Defendant is appropriate where the facts of record establish that there is no genuine issue of material fact and that movant Defendant is entitled to judgment as a matter of law.[8] I have accepted all non-disputed facts of record, and I have viewed any disputed facts of record, in a light most favorable to non-movant Plaintiffs.[9] If it appears to me that further inquiry into the facts is necessary or desirable to clarify the application of the law to the facts, or if there are genuine issues of material fact for consideration by the jury, then summary judgment is not appropriate.[10]

---

[8] Super. Ct. Civ. R. 56(c); *Doe v. Cahill*, 884 A.2d 451, 462-63 (Del. 2005).
[9] *Doe*, 884 A.2d at 462-463.
[10] *Id.,* At 463.

6

**Burden of Proof**

The burden of proof is on movant Defendant to prove that there is no genuine issue of material fact.[11] Once this showing is made, the burden shifts the non-movant Plaintiffs to prove that there are genuine issues of material fact.[12]

## CCB SUMMARY JUDGMENT MOTION

**Premises Liability**

CCB argues in its Motion for Summary Judgment that it only owns the land and some of the equipment at The Pond as a commercial landlord, which it leased to The Pro Shop, Inc. CCB was not involved in any aspect of the operation of The Pond, including without limitation the use of The Pond by business invitees, the operation of hockey camps, or the sale of hockey or ice-skating merchandise. Thus, argues CCB, it is too far removed from "control" over the leased premises, which is a necessary element under Delaware law to support a liability claim against it.

The test under Delaware law for determining whether a landowner and landlord is liable for the criminal actions of its tenant or subtenant on the leased

---

[11] *Doe*, 884 A.2d at 462-63; *Moore v. Sizemore*, 405 A.2d 679, 680-81 (Del. 1979).
[12] *Moore*, 405 A.2d 679 at 680-681.

7

premises with respect to business invitees is "whether the landowner/landlord had *control* of the premises [emphasis supplied]."[13] "Control" as used in this context means "the authority to manage, direct, superintend, restrict or regulate."[14] Under Delaware law, *actual* control of the leased premises is required.[15] Actual control can be demonstrated by the landlord's physical possession of the premises, which is inapposite here, or by the landlord's exercise of "control which amounts to *actual management* of the leased premises. [Emphasis supplied]"[16] Thus, although no Delaware case or statute specifies the precise degree of control required, it must be enough to constitute actual management of the leased premises.

Both the *Thomas* and *Craig* cases were rulings on Motions for Summary Judgment by defendants under Superior Court Civil Rule 56, both involved tort claims by injured plaintiffs against non-possessory landlords/landowners and tenants where the premises were a mobile home park and a shopping mall, respectively, and in both cases the Court granted the Motions for Summary Judgment. *Hastings* acknowledged that, in *Koutoufaris v. Dick*, the Delaware Supreme Court stated that disputed questions of control are ordinarily "best

---

[13] *Thomas v. Hastings*, 2001 WL 1456837, at *2 (Del. Super. Aug. 31, 2001), *aff'd* 791 A.2d 751 (Del. 2002).
[14] *Id.*
[15] *Id.*
[16] *Craig v. A.A.R. Realty Corp.*, 576 A.2d 688, 695-696 (Del. Super. 1989).

8

reserved for jury determination."[17]  However, like the plaintiffs in *Thomas* and *Craig*, Plaintiffs and CCB in the case *sub judice* are not disputing whether there was *any* control, but rather the *degree* of control; i.e., did CCB have a degree of control which rose to the level of actual management of the leased premises? Plaintiffs point to the fact that CCB had the right under the lease to approve subtenants.  However, such provisions are ubiquitous in commercial leases and ordinarily (as here) do not require the landlord to evaluate the subtenant beyond its creditworthiness and its ability to pay rent and otherwise comply with the terms of the lease. CCB points to the facts that, although it reserves the right under the lease to exercise control over the parking lots and common areas and facilities, it is not involved in the ongoing operation or management of The Pond, has no employees, and exists solely for the purpose of owning and leasing the premises.

**Imputed Liability**

CCB further argues in its Motion for Summary Judgment that Bicking initially had no ownership interest in CCB, eventually had only a minority ownership interest in CCB, was not involved in management of CCB, was not employed by CCB, had no authority over the operation of CCB, and was not an agent or manager of CCB.  Since Bicking was not an agent, employee or manager

---

[17] 604 A.2d 390, 402 (Del. 1992).

9

of CCB, there is no basis for CCB to be found liable for the imputed negligence of Bicking under Plaintiffs' theories of agency, negligent hiring and supervision, or *respondeat superior*.

Plaintiffs respond that, as a matter of agency law, CCB is liable for injuries sustained by Plaintiffs under a theory of the imputed negligence of Robert Campbell, the managing member of CCB. They cite several cases from the Delaware Court of Chancery holding that both the knowledge[18] and the actions[19] of a managing member of a limited liability company are imputed to the limited liability company. They argue that, since Campbell was a partial owner and the managing member of CCB, his knowledge about Bicking's prior misconduct and failure to check with Bicking's previous employer, Robert Sutherland and Power Play, are imputed to CCB.

In 2001, when The Pro Shop leased the pro shop from The Pond, Inc., and CCB approved the sublease, Robert Campbell was the majority owner and

---

[18] *B.A.S.S. Grp., LLC v. Coastal Supply Co., Inc.*, 2009 WL 1743730, at*6 (Del. Ch. June 19, 2009) (citing *Triton Constr. Co. v. E. Shore Elect. Servcs.*, 2009 WL 1387115 (Del. Ch. May 18, 2009)). Fn, 72 of *Triton* states: "Delaware courts consistently have imputed to a corporation the knowledge of an officer or director of the corporation when acting on its behalf. *See, e.g., Teachers' Retirement System of La. v. Aidinoff,* 900 A.2d 654, 671 n. 23 (Del.Ch.2006) (citing *Carlson v. Hallinan,* 2006 WL 771722, at *21 (Del.Ch. Mar.21, 2006); *In re HealthSouth Corp. S'holders Litig.,* 845 A.2d 1096, 1108 n. 22 (Del.Ch.2003)). I see no reason why the rule would be any different for a member of an LLC who has management rights".

[19] *Gassis v. Corkery,* 2014 WL 3565418, at *5 (Del. Ch. July 21, 2014), aff'd 113 A.3d 1080 (Del. 2015); *B.A.S.S.,* supra,; *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC,* 2012 WL 1869416, at *15 (Del. Ch. May 16, 2012); *Grand Ventures, Inc. v. Whaley,* 622 A.2d 655, 665 (Del. Super. 1992).

managing member of CCB. As stated above, Plaintiffs allege that Campbell was aware of Bicking's prior employment by Robert Sutherland and Power Play, and the reasons for his termination from that employment. However, neither Campbell nor CCB contacted Sutherland about this. The record reflects that, if asked, Sutherland would have disclosed this information to CCB. Plaintiffs essentially argue that CCB's imputed knowledge of Bicking's past criminal conduct was such that it should reasonably have anticipated subsequent criminal conduct by Bicking; i.e., that such conduct was foreseeable. Thus, the argument goes, CCB had a duty to protect business invitees against such prospective criminal conduct.[20] Breach of that duty, causation and damages resulting therefrom would ordinarily be factual issues for the jury mitigating against summary judgment.[21]

Under the Delaware agency law doctrine of *respondeat superior*, the knowledge of an agent acting within the scope of his employment may be imputed to his principal.[22] However, under the "Adverse Interest Doctrine," a malfeasant agent's knowledge and conduct may not be imputed to his principal where the agent is acting

---

[20] **RESTATEMENT (SECOND) OF TORTS** § 344 (1965), Comment (f), provides that, since the landlord is not an insurer of the business invitee's safety, it is ordinarily under no duty to exercise any care until it knows or has reason to know that the acts of the third person are occurring, or are about to occur, on the premises. However, if the landlord's past experience is such that it should reasonably anticipate criminal conduct on the part of a third person he may be under a duty to take precautions against it.

[21] *Ebersole v. Lowengrub*, 180 A.2d 467, 468 (Del. 1962).

[22] *Verrastro v. Bayhospitalists, LLC*, 208 A.3d 720 (Del. 2019).

11

solely to advance his own personal financial interest, rather than that of the principal.[23] Total abandonment of the principal's interests is needed to invoke the Adverse Interest Doctrine.[24] However, such an adverse interest may still be imputed to the principal under the "Sole Actor Doctrine," where the malfeasant agent totally dominates the principal.[25] No facts of record support the imputation of Campbell's knowledge or conduct vis-à-vis Bicking to CCB under these various theories. Campbell is not a party to this litigation. He was not the only member of CCB, and the record does not indicate whether other members knew about Bicking's alleged misconduct, or whether Campbell's knowledge and conduct were outside of the scope of his management of CCB. It does not appear that Campbell was acting solely to advance his own personal financial interest under the Adverse Interest Doctrine. Nor does it appear that that Campbell totally dominated CCB under the Sole Actor Doctrine.

In any event, I need not address Plaintiffs' discussion of the law of imputed negligence by CCB under general agency law, or their discussion of the other elements of a negligence claim, against CCB.[26] As Plaintiffs' own Response to CCB's Motion for Summary Judgment states (at page 17), these arguments pertain under Delaware law only if CCB exercised control which amounted to actual management of the leased premises under the *Thomas* and *Craig* cases, *supra.*

---

[23] *In re Am. Int'l Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872 (Del. Ch. 2009).
[24] *Id.* at 891.
[25] *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 359-360 (3d Cir. 2001).
[26] These issues are addressed with respect to The Pro Shop's Motions for Summary Judgment, *post.*

12

In my view, the facts of record that are before me do not support the proposition that CCB exercised a degree of control over The Pond which amounted to actual control of the leased premises. There is no genuine issue of material fact relating to this control issue. Under Delaware law, CCB was not in control of the premises. Therefore, CCB's Motion for Summary Judgment is granted.

## PRO SHOP SUMMARY JUDGMENT MOTIONS

### Negligent Hiring and Supervision

The Pro Shop argues in its Motion for Summary Judgment on Negligent Hiring and Supervision that Bicking was a part owner of The Pro Shop (the other owner was Robert Campbell), but he was never hired by The Pro Shop nor did he have a set position at The Pro Shop. He compensated himself with a "managerial salary." He handled administrative Pro Shop tasks from his office at The Pond, not The Pro Shop. He had no supervisor; rather, all employees of The Pro Shop worked under his supervision. The alleged sexual abuse occurred in his office at The Pond, not in The Pro Shop.

Under Delaware law, an employer is liable for negligent hiring and supervision in the "giving of improper or ambiguous orders or in failing to make proper regulations, or in the employment of improper persons involving risk of harm to others, or in the supervision of the employee's activity."[27] Thus, argues The Pro Shop, on the foregoing

---

[27] *Simms v. Christiana School Dist.*, 2004 WL 344015, *8 (Del. Super. Ct. Jan. 30, 2004).

facts the fundamental requirement of Plaintiffs' negligence claim – that The Pro Shop had a duty to act reasonably in the "hiring" and "supervision" of Bicking – fails.

**Imputed Liability**

Plaintiffs respond, however, that, even if Bicking is not deemed to have been "employed" or "supervised" by The Pro Shop, his conduct is nonetheless imputed to The Pro Shop, and Campbell's knowledge and conduct are also imputed to The Pro Shop.

**Bicking's Conduct**

Plaintiffs make the same arguments under principles of agency law with respect to the imputation of Bicking's conduct to The Pro Shop as they make with respect to the imputation of Campbell's conduct to CCB (see discussion, *supra*). I need not repeat that discussion here. One difference here, though, is that the issue of "control" being too far removed under the *Thomas* and *Craig* cases does not apply to The Pro Shop. The Pro Shop exercised actual control of the leased premises. It subleased space at The Pond, directly ran and operated the sale of hockey or ice-skating merchandise, catered to business invitees to The Pond, and was involved in the operation of hockey camps. Thus, The Pro Shop may be liable for a claim of imputed negligence.

There is also a qualitative difference in the relationship between Bicking and The Pro Shop and the relationship of Campbell and CCB. As discussed above, in

14

their Response Plaintiffs discuss the Adverse Interest Doctrine, under which ordinarily there would be an exception for imputation of an agent's conduct to the principal if the agent's conduct were totally adverse to the interests of the principal. However, there is an "exception to the exception" where the agent completely dominates the principal under the Sole Actor Exception.[28] In such a case, the agent's adverse conduct is nonetheless imputed to the principal. The Sole Actor exception applies in Delaware.[29]

Here, the facts of record support the argument that Bicking dominated The Pro Shop. Bicking formed The Pro Shop, owned The Pro Shop, drew a salary from The Pro Shop, and worked in The Pro Shop. Bicking *was*, in effect, The Pro Shop. Thus as a matter of law The Pro Shop may be held liable for Bicking's conduct. This is a factual issue for the jury, not me, to determine.

### Campbell's Knowledge and Conduct

Campbell was a 50% owner of The Pro Shop. Plaintiffs make the same arguments under principles of agency law with respect to the imputation of Campbell's negligence to The Pro Shop as they make with respect to the imputation of his negligence to CCB (see discussion, *supra*). I need not repeat that discussion here. This is a factual issue for the jury, not me, to determine.

---

[28] *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., supra,* permitting imputation of fraudulent conduct of directors to debtor corporation because the directors dominated the corporation.
[29] *Stewart v. Wilmington Tr. SP Servs., Inc.,* 112 A.3d 271, 310-11 (Del. Ch. 2015), *aff'd* 126 A.3d 1115 (Del. 2015).

15

## The Pro Shop's Knowledge

The facts of record support the conclusion that The Pro Shop had general knowledge of Bicking's reputation as a pedophile, wholly apart from Campbell's knowledge. His inappropriate actions towards young boys were open and notorious at The Pond and The Pro Shop. A jury could find that The Pro Shop was negligent in failing to respond appropriately with some sort of remedial action where there was evidence that Bicking was engaged in criminal conduct and could be expected to engage in criminal conduct in the future, yet failed to take remedial action or other precautions against such conduct.

For all of the reasons stated above, in my view there are genuine issues of fact relating to the negligent hiring and supervision issue. Under Delaware law, a jury could reasonably find The Pro Shop liable under a theory of imputed negligence. Therefore, The Pro Shop's Motion for Summary Judgment on the issue of negligent hiring and supervision is denied.

### Vicarious Liability; *Respondeat Superior.*

This Motion for Summary Judgment by Plaintiffs poses consequential issues under Delaware law. There is disagreement among Delaware courts as to the scope of vicarious liability under the doctrine of *respondeat superior* following the Delaware Supreme Court's recent decision in *Sherman v. State Dep't of Pub.*

16

*Safety.*[30] In *Sherman*, a uniformed Delaware State Police Officer validly arrested a woman ("Doe"), who was subject to an outstanding *capias*, for shoplifting. The Officer allegedly told Doe that, if she performed oral sex on him, he would take her home and she could just turn herself in on the *capias* the next day. If she refused, he would process her arrest by taking her to court, where bail would be set, and she would spend the weekend in jail. The Officer received oral sex from Doe while she was under arrest. Doe reported the Officer to the Delaware State Police, which eventually arrested and charged the Officer with a variety of criminal offenses.[31] The issue on appeal was the jury's finding that the State of Delaware was not responsible in tort as the Officer's employer for his misconduct. The Delaware Supreme Court, overruling two of its own decisions in prior appeals by Doe, and reluctantly departing from the law of the case, reversed and held that, as a matter of law, the State of Delaware was responsible in tort as the Officer's employer for his misconduct. The Court remanded for entry of a judgment in Doe's favor on the issues of liability, with a jury trial to follow on the issue of damages. There were two robust dissents.

The Court focused on Restatement (Second)[32] Agency §228 ("§ 228") and

---

[30] 190 A.3d 148 (Del 2018).

[31] Doe is deceased and her estate sued the State of Delaware; the Officer killed himself shortly after his arrest.

[32] Although the Restatement (Second) of Agency has been superseded by the Restatement (Third)

Restatement (Second) Agency §219 ("§ 219"), and applicable cases. It found that § 228, which has been adopted as Delaware law,[33] should operate within the context of its Restatement counterpart, § 219, as the Restatement intends. Section 219 "enumerates the situations in which a master may be liable for torts of servants acting solely for their own purposes and hence not in the scope of employment."[34] When § 219's exceptions apply, an employer can be held responsible under *respondeat superior* even if § 228 is not satisfied. Two subsections of § 219 have potential applicability here. Section 219(2)(c) provides an exception to the scope of employment requirement for cases in which the employee's "conduct violated a non-delegable duty of the master," and § 219(2)(d) does the same for cases where the employee "was aided in accomplishing the tort by the existence of the agency relation."[35] The Court then held:

> "Here we hold that, as a matter of law, if a police officer makes a valid arrest and then uses that leverage to obtain sex from his arrestee, his misconduct need not fall within the scope of his employment under § 228 to trigger his employer's liability. In so finding, we take into account the **unique, coercive authority** entrusted in our police under Delaware law, and the reality that when an arrestee is under an officer's authority, she cannot resist that authority without committing a crime. Because **the Officer's position aided him in obtaining sexual favors**—satisfying § 219(2)(d)—and **the State owed a non-delegable duty to safeguard** the arrestee from harm while she was under arrest—

Agency, Delaware continues to follow the Restatement (Second) Agency.

[33] *See Wilson v. Joma, Inc.*, 537 A.2d 187 (Del. 1988); *Coates v. Murphy*, 270 A.2d 527 (Del. 1970); *Draper*, 181 A.2d 565; *Hecksher v. Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1200 (Del. 2015) ("In determining whether tortious conduct is within the scope of employment, Delaware courts will consider the factors outlined in the Restatement (Second) of Agency ....") (citing Restatement (Second) of Agency § 228 (1958) ).

[34] Restatement (Second) of Agency § 219 cmt. e (1958).

[35] *Id.*, § 219(2)(c); *id.*, § 219(2)(d).

18

satisfying § 219(2)(c)—Doe does not have to satisfy § 228 for the State to be liable for the Officer's sexual misconduct." [Emphasis Supplied][36]

The first case to address § 228 and § 219 after *Sherman* is *Bates v. Caesar Rodney School District*.[37] In that case, a high school teacher and head wrestling coach engaged in a sexual relationship with a 17-year-old student and volunteer wrestling team manager and teacher's aide for one of the coach's gym classes.[38] Bates sued, *inter alia*, the school district, the high school and the board of education on four separate tort counts. They moved for summary judgment, arguing that §228 applies in Delaware and under that section Howell was acting outside the scope of his employment. While that motion was pending, *Sherman* was decided and added § 219 to the *respondeat superior* landscape. Relying on *Sherman*, Bates moved for summary judgment herself. The Court in *Bates* first found that Howell was not acting within the scope of his employment with the defendants under § 228, so only § 219 could apply. It then held that (1) § 219 does not apply to teachers, and (2) even if § 219 did apply to teachers, it did not apply to the specific facts of that case. The Court granted Summary Judgment to the defendants and dismissed the tort claims, and denied the cross motion for summary judgment.

The Court rejected the contentions that (1) teachers possess the requisite coercive authority necessary to trigger the § 219(2)(d) exception; (2) the teacher was

---

[36] *Sherman*, 190 A.3d 148, at 154 (footnotes omitted).
[37] 2018 WL 7021959 (Del. Super. Nov. 30, 2018).
[38] The coach was arrested, pled guilty to rape, and was incarcerated.

19

aided in accomplishing the tort because of the existence of the student-teacher relationship; and, (3) the school breached a non-delegable duty to protect students from sexual abuse under § 219(2)(c). The Court stressed the limitations which the Delaware Supreme Court placed on the § 219 exception stated in *Sherman*:

"In finding that [§ 219] applies to this case, we take into account the critical difference between police officers who act to arrest people and employees of most businesses. However important plumbers, electricians, accountants, and myriad other providers of services are to their customers, none of them wield the potent coercive power entrusted to our police under our laws."[39]

As discussed more fully below, I respectfully disagree. High school teachers and coaches bear the imprimatur of authority with respect to their students – they are not like "plumbers, electricians, or accountants, and myriad other **providers of services ...** to their **customers.**" [Emphasis Supplied] Teachers and coaches are not plumbers, and students are not customers. Students look up to their teachers and coaches as role models and authority figures, and teachers and coaches do not provide "services" like plumbers, electricians or accountants. Teachers' and coaches' "services" are critical to the formation of character and the intellectual development of their students. As such, the existence of the student-teacher relationship imposes a heavy incentive on the student to obey a teacher or coach, lest she get into trouble, get bad grades or otherwise be marginalized by the teacher or coach. Just because teachers and coaches do not carry handcuffs or guns does not mean that they lack coercive

---

[39] *Sherman*, 190 A.3d 148, at 181.

20

authority. To say that, as a matter of Delaware law for purposes of granting a motion for summary judgment, § 219 does not apply to the entire teaching and coaching profession paints with too broad a brush.[40]

The next case to address § 228 and § 219 after *Sherman* is *Smith v. Liberty Mutual Insurance Company*.[41] In *Smith*, which does not cite *Bates*, a minor high school student who also worked as a student aide filed a complaint against the school board and a baseball coach/health teacher who was employed by the school board on four tort grounds related to sexual misconduct. In a separate action, the coach/teacher sued the liability insurer of the school board to compel it to defend him in the underlying complaint. The insurer filed a motion for summary judgment and argued, *inter alia*, that the occurrence was not covered since (1) the coach/teacher was not acting within the scope of his employment under § 228 and therefore the school board was not vicariously liable for his torts of the under the doctrine of *respondeat superior*, and (2) the coach/teacher's behavior met none of the exceptions enumerated in § 219. The coach/teacher also filed a motion for summary judgment and conversely argued that (1) he *was* acting within the scope of his employment under § 228, and (2) even if he was not acting within the scope of his

---

[40] Indeed, 11 *Del C.* §778 provides severe penalties for several classes of felonies under the rubric of the "sexual abuse of a child by a person in a position of trust, authority or supervision." The legislative history indicates that a variety of authority figures were contemplated as "persons in a position of trust, authority or supervision," including teachers and coaches. If such behavior has been criminalized, how can it lack coercive power?

[41] 201 A.3d 555 (Del. Super. 2019).

employment, his behavior met one or more of the exceptions enumerated in § 219. The Court denied the insurer's motion for summary judgment, and granted the coach/teacher's motion for summary judgment.

I agree with the *Smith* Court's conclusion, but not with the way it reached the conclusion. The Court concluded that "all four prongs in § 228 are satisfied and § 219 is also satisfied."[42] In my view, this is logically impossible. One Section or the other of the Restatement must apply, but not both. As another Court recently stated:

> "I note a flaw in *Smith's* analysis of *respondeat superior* liability. Contrary to the Court's finding in *Smith*, it is impossible for an employer to be liable for an employee's illegal conduct under both the § 228 test and the § 219 exceptions. As explained *supra,* the § 228 test is used to determine whether an employee's misconduct occurred within the scope of their employment. On the other hand, the § 219 exceptions support employer liability even if an employee acts "solely for their own purposes and hence not in the scope of employment." Clearly, the same conduct cannot, at the same time, be both "within the scope of employment" and "not in the scope of employment." If a court finds that an employee's conduct satisfies the § 228 test, as was the case in *Smith*, then any further consideration of § 219 is moot."[43]

For me the better analysis is that the coach/teacher was *not* acting within the scope of his employment under § 228, but the insured school board, and therefore its insurer, is nonetheless liable under § 219(2)(c) and § 219(2)(d).

On the other hand, I strongly agree with *Smith's* analysis of § 219(2)(c) and §219(2)(d). As stated in the *Smith* opinion:

---

[42] *Smith*, 201 A.3d 555, at 565.
[43] *Collins v. Dutton*, 2019 WL 6048979, at *7 (Del. Super. November 14, 2019).

22

"In *Sherman* the Court found that under § 219(2)(c) the State has a non-delegable duty to arrestees "[b]ecause under Delaware law it is a crime to resist arrest, even peaceably, the arrestee has no option but to remain under the arresting officer's domain."

Here, students attending school in the Appoquinimink School District are in the care of the school and must surrender authority to the adults in charge. Additionally, students are not free to leave the school after arrival until the end of the school day unless the student has authorization to leave. Students who defy the school's authority or leave the school without authorization are subject to detention, suspension, and police intervention. Therefore, it appears that schools would owe a similar duty to students in their custody as the State owes to an arrestee in its custody.

In addition, the facts of the instant case satisfy § 219(2)(d). As in *Sherman*, where the Court held that police have "unique, coercive authority entrusted [to them]," teachers also have unique, coercive authority entrusted to them and leverage over students. Indeed, a student may face immediate or future substantial risk for insubordination or challenging a teacher's authority.

Moreover, the *Sherman* case concerned coercion upon an adult and held that the authority that police wield (over an adult) is coercive. The instant case involves the teacher's capacity to exercise authority over a more vulnerable person — a minor. Furthermore, the arrestee in *Sherman* was arguably in police custody as a result of her own adult conduct. In contrast, a minor's attendance at school is compulsory and a teacher's authority begins upon a student's enrollment and is not precipitated by any act affirmatively committed by a minor.

Here, it reasonably could have appeared to [the student], who was a minor, that [the coach/teacher's] exercise of authority, however allegedly alarming, derived from his employer and employment status. According to the underlying complaint, other school board employees aided [the coach/teacher] in interrupting [the student's] AP classwork to pull her out for [the coach/teacher] to wish her good luck, employees of the school watched [the coach/teacher] put his arm around [the student] and did not intervene, and the school board required [the student] to give her personal cell phone number to [the coach/teacher]. As with the arrestee in *Sherman*, it would not be unreasonable for a minor to believe that there would be adverse consequences and undesirable repercussions if she challenged or acted insubordinately to [the coach/teacher's] authority that was open and apparent to her, other students (the baseball players whom he allegedly ignored), and other school board employees.

23

Moreover, under § 219(2)(d), it appears that [the coach/teacher] was aided in his alleged tortious acts by the existence of his agency relation with the school. [The student] was evidently instructed to reveal her cell phone number to [the coach/teacher] because she served as his student aide, which made it possible for [the coach/teacher] to harass [the student] via text messages. In addition, [the coach/teacher] used his role as an agent of his employer (which gave him authority over students and access to school property) to pull [the student] out of her AP class so that he could hug her, to have her come into his office where he allegedly made an inappropriate comment to her, to overly focus on her in the weight room, and to wait for her as she passed by his office. Had [the coach/teacher] not been a teacher, on school property, and functioning in a supervisory role over minors during school hours, he would have had no authority or ability to commit some of these alleged acts and [the student] would not have been allegedly harmed by him."[44]

The distinction between the analysis of the student–coach/teacher relationship in the *Bates* and *Smith* cases could not be starker. I adopt the *Smith* analysis.

The most recent case to address § 228 and § 219 after *Sherman* is *Collins v. Dutton*.[45] In *Collins*, a staff member and employee of the school board who was working primarily in the school theater allegedly assaulted a minor high school student on school premises. She filed a number of tort claims against both the teacher and the school board, its superintendent and other school-related defendants (the latter, collectively, the "School Defendants"), including assault and battery, gross negligence, premises liability, intentional infliction of emotional distress, and negligent infliction of emotional distress. The School Defendants moved to dismiss for failure to state a claim under Superior Court Civil Rule

---

[44] *Smith*, 201 A.3d 555, at 568 – 570 (footnotes omitted).
[45] 2019 WL 6048979 (Del. Super. November 14, 2019).

24

12(b)(6), rather than a motion for summary judgment. Although the legal standards of review differ for the two types of motions, they still give strong deference to the non-movant's (plaintiffs') allegations.[46] The Court granted the motion and dismissed most of the plaintiffs' claims.

With respect to vicarious liability of the School Defendants under the doctrine of *respondeat superior*, the *Collins* Court rejected the *Smith* case's analysis for four reasons, which I address *seriatim* here. First, I agree with the Court in *Collins* that both §228 and § 219 cannot apply to the same set of facts. See page 22 and footnotes 42 and 43, *supra*.

Second, I disagree with the Court's statement in *Collins* that § 219 does not generally apply to the interactions between students and teachers, for the reasons articulated by the Court in *Smith*. *Collins* states that *Smith's* dicta essentially operates to subject schools to strict tort liability for all torts committed by their employees against their students. I disagree: the exceptions of § 219 may or may not apply to a particular set of facts. *Collins*, echoing the dissent of Justice Valihura in *Sherman*,

---

[46] On a motion to dismiss for failure to state a claim under Superior Court Civil Rule 12(b)(6), "all well-pleaded allegations must be accepted as true." *Spence v. Funk*, 396 A.2d 967 (Del. 1978).[4] The motion must be denied if the plaintiff could "recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint." *Id.* The Court must read the complaint generously and view all well-pleaded allegations in a light most favorable to the plaintiff. *Bryce Thompson Inst. V. Medimmune, Inc.*, 2009 WL 1482237, at *4 (Del. Super. May 19, 2019). Dismissal is warranted only when "under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted." *Hedenberg v. Raber*, 2004 WL 2191164, at *1 (Del. Super. Aug. 20, 2004).

25

concludes that there are "staggering public policy implications of such a change in the law" and that such a decision is best left to the Delaware General Assembly. But the Delaware Supreme Court is empowered to change, or even reverse, existing Delaware tort law, as it did here by determining, for the first time in Delaware, that §219 may apply if § 228 does not apply. I agree with *Collins* that *Sherman* and other decisions of this and other Delaware courts may have public policy implications, but that does not necessarily mean that such public policy implications are undesirable. For example, schools and school boards, the Department of Public Safety, The Pro Shop and other public and private institutions, principals and employers – and their liability insurers[47] -- may be better equipped to bear the damages resulting from the tortious conduct of their agents and employees than individual tortfeasors, who may well be judgment proof. Moreover, such employers are well positioned to adopt policies and procedures that address and prevent sexual assault by their employees, and to discipline their employees for violations of those policies. At the end of the day, members of the public who come into contact with employees of these employers will be better protected from sexual assault, and victims of sexual assault by such employees will be afforded more meaningful relief for their injuries, which is itself a laudable public policy goal.

---

[47] Note that *Smith* held that a school district's insurer had a duty to defend a high school gym teacher in an action brought by a student against the school district for the teacher's torts.

26

Third, I disagree with the Court in *Collins* that the *Smith* Court misapplied the holdings in *Sherman*, citing the *Bates* case, which held that § 219 generally does not apply to teachers. See my discussion above which disagrees with *Bates*, agrees with *Smith*, and concludes that teachers have an imprimatur of authority and power vis-à-vis their students such that § 219 may apply.

Fourth, the Court in *Collins* held that, *assuming arguendo* that § 219 applies to teachers generally, it did not apply to the facts of that case. That may well be. In the instant case, however, in my view the facts trigger both § 219(2)(c) and § 219(2)(d). The Pro Shop owed a non-delegable duty under § 219(2)(c) to its business invitees to safeguard them from harm while they were in The Pro Shop at The Pond. The record contains facts that numerous people at The Pro Shop and The Pond knew that Bicking had regular and multiple inappropriate sexual contacts with boys, other than Plaintiffs, on the premises. There were no policies or procedures in place with regard to such activity.

Bicking's position as a mentor, coach, and owner of The Pro Shop – just like the State Trooper in *Sherman* or the high school gym teacher in *Smith* -- aided him in obtaining sexual favors, satisfying §219(2)(d). The record contains facts that the boys, including the Plaintiffs, looked up to Bicking and considered him a role model and mentor. They were therefore intimidated and afraid to speak up when he made inappropriate sexual contact with them.

27

In my view, determinations to be made in this area of vicarious liability and the doctrine of *respondeat superior* may be distorted or oversimplified if we limit our review to the particular vocation of the tortfeasor (state trooper, teacher, coach, etc.) or the specific type of employer (public, private, etc.). Rather, if § 228 does not apply because the agent/employee acted outside the scope of his authority, then the key determination to be made under § 219(2)(d) should be whether, because of the imprimatur of authority conferred on the tortfeasor under the particular facts of the case, he or she has coercive power over the alleged victim. Moreover, we should consider whether the principal/employer has a non-delegable duty to its invitees under § 219(2)(c), or whether any of the other exceptions under § 219(2) apply.

Applying that test to the facts in this case, I find that Bicking had the imprimatur of authority and thus had coercive power over Plaintiffs under §219(2)(d). If one accepts pedophilia as a psychological or psychiatric disorder, nearly every reputable mainstream psychologist and psychiatrist regards pedophilia as a product of the exercise of coercive power. The child builds a relationship of trust with the pedophile at a deep level of psychological dependence. That trust and dependence later translate into an abuse of that confidence by the person exercising authority and power. Accessibility is the main factor in whom a pedophile abuses. This may explain the molestation of children in the Church, on athletic teams, and organizations like the

28

Scouts, where the pedophile more readily has access to more children. In these situations, the pedophile is given access to children to mentor, teach, coach, and advise. The pedophile is trusted by those around him, including children and their families, and then betrays that trust.

The fact that Plaintiffs in this case are boys, or were boys at the time of the incidents, is secondary. Pedophilia and homosexuality should not be conflated. No true pedophile is attracted to adults, so neither homosexuality nor heterosexuality applies. In fact, research shows that, for pedophiles, the gender of the child is immaterial. In trying to make sense of an adult male's sexually abusing a male child, many people mislabel it as an act of homosexuality, when it is really an act of coercive power. In reality, abuse of boys by gay pedophiles is rare, and the abuse of girls by lesbians is rarer still. Nicholas Groth is a noted authority on this topic. In a 1982 study, Groth writes:

> "Are homosexual adults in general sexually attracted to children, and are pre-adolescent children at greater risk of molestation from homosexual adults than from heterosexual adults? There is no reason to believe so. The research to date all points to there being no significant relationship between a homosexual lifestyle and child molestation. There appears to be practically no reportage of sexual molestation of girls by lesbian adults, and the adult male who sexually molests young boys is not likely to be homosexual."[48]

I further find that The Pro Shop had non-delegable duty to protect its

---

[48] A. Nicholas Groth, Ph.D., William F. Hobson, M.S. & Thomas S. Gary, M.Ed., "The Child Molester; Clinical Observations," Journal of Social Work & Human Sexuality, Volume 1 (1982), at 147.

business invitees under § 219(2)(c). Given Bicking's past known behavior and widespread reputation for inappropriate sexual contact with children, The Pro Shop either knew or should have known that its business invitees might be subjected to such contact, and should have taken steps to prevent that from happening.

Thus, I cannot grant summary judgment for The Pro Shop on the issue of *respondeat superior*, because there are genuine issues of material fact as to both of these § 219(2) exceptions that can only be determined by the jury.

### Ratification by The Pro Shop.

Finally, Plaintiffs argue that The Pro Shop ratified Bicking's tortious conduct and is therefore liable under § 228 as well as § 219. As discussed above, both of these sections cannot apply, so I need not address this argument.

### CONCLUSION

The facts of record do not support the proposition that CCB exercised actual control over the premises. Since there is no genuine issue of material fact regarding this control issue, CCB's Motion for Summary Judgment is granted.

There are genuine issues of material fact relating to the negligent hiring and supervision issue. Under Delaware law, a jury could reasonably find The Pro Shop liable under a theory of imputed negligence. Therefore, The Pro Shop's Motion for Summary Judgment on the issue of negligent hiring and supervision is denied.

30

Although The Pro Shop may not be liable for Bicking's tortious conduct because he was acting outside the scope of his employment, it may be liable under Restatement (Second) Agency § 219(2)(c) and § 219(2)(d). There are genuine issues of material fact for the jury. Therefore, The Pro Shop's Motion for Summary Judgment on the issue of *respondeat superior* is denied.

I grant CCB's Motion for Summary Judgment, and I deny both of The Pro Shop's Motions for Summary Judgment.

**IT IS SO ORDERED.**

_____
Craig A. Karsnitz

cc:    Prothonotary's Office
       Parties of Record
       Counsel of Record

FILED PROTHONOTARY
SUSSEX COUNTY
2020 JAN 22 P 3: 02

31